# Exhibit 1

Christopher J. Bakes
Allen C. Wasserman
Casey B. Howard
LOCKE LORD LLP

200 Vesey Street, 20th Floor
New York, New York 10281
(212) 415-8600
cbakes@lockelord.com
awasserman@lockelord.com
choward@lockelord.com
*Attorneys for Plaintiff Leslie Benzies*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------------------------X

LESLIE BENZIES,

                    Plaintiff,

    -vs-

TAKE-TWO INTERACTIVE SOFTWARE, INC.,
ROCKSTAR GAMES, INC., ROCKSTAR NORTH
LTD., DAN HOUSER AND SAM HOUSER,

                  Defendants.

-------------------------------------------------------------------------X

**SUMMONS WITH NOTICE**

Index No.: _____

Date Index No. Purchased

_____

To the Persons Named as Defendants Above:

      PLEASE TAKE NOTICE THAT YOU ARE HEREBY SUMMONED to appear in this action by serving a notice of appearance on the Plaintiff at the address set forth below within 20 days after the service of this Summons (not counting the day of service itself), or within 30 days after service is complete if the summons is not delivered personally to you within the State of New York.

      YOU ARE HEREBY NOTIFIED THAT should you fail to answer or appear, a judgment will be entered against you by default for the relief demanded below.

Dated: April 11, 2016

          *s/ Allen C. Wasserman* _____
          ALLEN C. WASSERMAN

          LOCKE LORD LLP
          200 Vesey Street, 20th Floor
          New York, New York 10281
          (212) 415-8600

Defendants' Addresses:                    Take-Two Interactive Software, Inc.
                                          622 Broadway
                                          New York, New York  10012

                                          Rockstar Games, Inc.
                                          622 Broadway
                                          New York, New York  10012

                                          Rockstar North, Ltd.
                                          1 Greenside Row
                                          EH1 3AN
                                          Edinburgh, Scotland

                                          Dan Houser
                                          c/o Rockstar Games, Inc.
                                          622 Broadway
                                          New York, New York  10012

                                          Sam Houser
                                          c/o Rockstar Games, Inc.
                                          622 Broadway
                                          New York, New York  10012

<u>Notice</u>:  The nature of this action is:

Dispute arising from plaintiff's employment with Defendant Rockstar North Ltd., including claims under Employment Agreement, Royalty Plan, Sabbatical Agreement, Mediation Agreement and related agreements.  Claims arising from dispute are:  (1) Breach of Fiduciary Duty against Defendant Sam Houser; (2) Fraudulent Inducement and Fraudulent Concealment against Defendant Sam Houser; (3) Aiding and Abetting Breach of Fiduciary Duty against Defendants Take-Two Interactive Software, Inc. and Rockstar Games, Inc.; (4) Breach of Contract and Breach of Implied Duty of Good Faith and Fair Dealing (the Royalty Plan) against Defendants Take-Two Interactive Software, Inc., Rockstar Games, Inc., Sam Houser and Dan Houser; (5) Tortious Interference with Contract (the Sabbatical Agreement) against Defendants Take-Two Interactive Software, Inc., Rockstar Games, Inc. and Sam Houser; (6) Unjust Enrichment against Defendants Sam Houser and Dan Houser; (7) Tortious Interference with Contract against Defendants Sam Houser and Dan Houser; (8) Reformation (the Royalty Plan) against Defendants Take-Two Interactive Software, Inc., Rockstar Games, Inc., Sam Houser and Dan Houser; (9) Constructive Trust against Defendants Take-Two Interactive Software, Inc., Sam Houser and Dan Houser; (10) Breach of Contract (the Sabbatical Agreement) against Defendant Rockstar North Ltd; (11) Constructive Discharge (the Employment Agreement) against Defendant Rockstar North Ltd.; (12)

2

Declaration of Rights (the Employment Agreement) against Defendant Rockstar North Ltd.; (13) Breach of Contract (the Mediation Agreement) against Defendant Take-Two Interactive Software, Inc.; (14) Defamation Per Se against Defendant Take-Two Interactive Software, Inc.; and (15) Fraud against Defendants Take-Two Interactive Software, Inc., Rockstar Games, Inc. and Sam Houser.

The relief sought is in an amount to be determined at trial but believed to be in excess of $150,000,000.00.

Should Defendants fail to appear herein, judgment will be entered by default for the sum of $150,000,000.00, with interest from the date of December 31, 2014 and the costs of this action.

Venue:  Plaintiff designates New York County as the place of trial.  The basis of this designation is pursuant to CPLR § 501 because written agreements of parties fix venue as New York County.

CHI1 816976v.1

3

Christopher J. Bakes
Allen C. Wasserman
Casey B. Howard
LOCKE LORD LLP

200 Vesey Street, 20th Floor
New York, New York 10281
(212) 415-8600
cbakes@lockelord.com
awasserman@lockelord.com
choward@lockelord.com
*Attorneys for Plaintiff Leslie Benzies*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
   ·
LESLIE BENZIES,    ·
   · Index No. 651920/2016
   PLAINTIFF,    ·
   ·
   ·
   – AGAINST –    ·
   ·
   ·
TAKE-TWO INTERACTIVE SOFTWARE, INC.,    ·
ROCKSTAR GAMES, INC., ROCKSTAR NORTH LTD,    ·
DAN HOUSER AND SAM HOUSER,    ·
   ·
   DEFENDANTS.    ·
   ·
   ·
   ·
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## **COMPLAINT**

Plaintiff Leslie Benzies ("Mr. Benzies" or "Plaintiff"), by and through his attorneys, Locke Lord LLP, for his complaint against Take-Two Interactive Software, Inc. ("Take-Two"), Rockstar Games, Inc. ("Rockstar"), Rockstar North Ltd. ("Rockstar North") (collectively referred to as "companies" or "Companies"), Dan Houser and Sam

1

Houser (all collectively referred to as "Defendants" ), upon knowledge and belief as to his own acts and upon information and belief as to the acts of all others, states as follows:

## PARTIES

1.      Plaintiff is a citizen of the United Kingdom with a residence in Los Angeles, California.

2.      Defendant Take-Two is a Delaware corporation with its principal place of business located at 622 Broadway, New York, New York.

3.      Defendant Rockstar is a Delaware corporation with its principal place of business located at 622 Broadway, New York, New York.  It is a wholly-owned subsidiary of Take-Two and is a "label" or "brand" through which Take-Two markets its video-games and other products.

4.      Defendant Rockstar North is a wholly-owned subsidiary of Take-Two with its principal place of business located at 1 Greenside Row, Edinburgh, Scotland, United Kingdom.

5.      Defendant Sam Houser is an individual residing in New York State with his place of business at Rockstar, located at 622 Broadway, New York, New York.

6.      Defendant Dan Houser is an individual residing in New York State with his place of business at Rockstar, located at 622 Broadway, New York, New York.

## JURISDICTION AND VENUE

7.      The Court has personal jurisdiction over the parties under Section 3.5 of the applicable "2009 Royalty Plan," and Section 8(i) of the Amended and Restated Employment Agreement between Plaintiff and Rockstar North, dated as of September 12,

2

2012, pursuant to which the parties submitted to the exclusive personal jurisdiction of any state or federal court sitting in New York County in the State of New York.

8.      Venue is proper pursuant to New York Civil Practice Law and Rules Section 501 because Section 3.5 of the 2009 Royalty Plan and Section 8(i) of the Amended and Restated Employment Agreement fixed the venue as New York County.

<u>**STATEMENT OF THE CASE**</u>

**<u>Introduction and Overview</u>**

9.      Mr. Benzies grew up in Elgin, Scotland with the desire to create amazing video games.  He started programming at age 11 and by age 12 had created his first video game.

10.      Mr. Benzies' love for video games continued into adulthood, causing him to strive to create better and better games by pushing the boundaries of video game technology.  After completing development of games such as Space Station Silicon Valley, Mr. Benzies turned his attention to the Grand Theft Auto ("GTA") video game series.  Led by Mr. Benzies, the close-knit team he assembled at DMA Design Ltd. ("DMA") created Grand Theft Auto 3 ("GTA 3"), the game that revolutionized the video game industry.

11.      Mr. Benzies was thereafter named president of Rockstar North, the lead development studio of Rockstar Games, and went on to lead the development of GTA Vice City, GTA San Andreas, GTA 4, GTA 5 and GTA Online.

12.      Given the world-record-breaking success of these GTA games, and Mr. Benzies' important contributions to that success, Defendants recognized the importance of retaining Mr. Benzies to produce and design future iterations of the GTA franchise.  To ensure this, Defendants offered Mr. Benzies the opportunity to be a "Rockstar Principal,"

3

an exclusive group of three with Sam Houser and Dan Houser, entitling him to share equally in the fortunes of company game creations through equal distributions of significant profit-sharing payments under the 2009 Royalty Plan.

13.     Appreciative of his inclusion as a "Rockstar Principal," Mr. Benzies worked tirelessly with his team at Rockstar North for five years to create GTA 4: The Lost and Damned; GTA 4: The Ballad of Gay Tony; and GTA 5.  During that time, Sam Houser regularly referred to Mr. Benzies as his "partner," sending dozens of emails praising his work and promising to always protect Mr. Benzies' interests.  Emails from Sam Houser to Mr. Benzies included statements such as "I've got your back," and "It is always a pleasure to look out for you," as well as "so proud to be partners with you," "Partners for real!!" and "Together Forever!"  GTA 5's release broke seven Guinness World Records and thrilled fans around the globe.  To date, GTA 5 has generated approximately $3 billion in sales.

14.     Seeming to recognize the tireless dedication required to produce this world-record-breaking economic success, the culmination of 19 years of diligence and achievement by Mr. Benzies and his team, in 2014 the Defendants flew Mr. Benzies to New York and encouraged him to take a six-month sabbatical to recharge his batteries. The Defendants told Mr. Benzies that the sabbatical was a well-earned rest period, and that "they greatly appreciated his dedication to its business and products."

15.     As it turns out, Defendants had a more permanent separation in store for Mr. Benzies, who when he attempted to return as scheduled from his sabbatical learned he had been ousted from Rockstar.  Mr. Benzies also learned that while he was away the Houser brothers had allocated at least $93,000,000 in profit-sharing payments to themselves, with another $523,000,000 in profits still unaccounted for.  During that period, Mr. Benzies did

4

not receive a single dollar in profit-sharing payments, a significant and dramatic departure from the former practice of profit-sharing equality among the three "Rockstar Principals."

**Early History**

16.    Mr. Benzies was hired in 1995 as a programmer for the United Kingdom video game developer DMA.

17.    DMA created, designed, and developed a variety of video games, including GTA 1[1] and GTA 2, precursors to the more famous and substantially more lucrative GTA 3 and subsequent entries to the GTA video game franchise.

18.    In 1997, Sam Houser and Dan Houser worked at BMG Interactive ("BMG"), which held publishing rights to GTA 1 and GTA 2.

19.    Take-Two acquired BMG in 1998 and created a subsidiary company named "Rockstar Games, Inc."  GTA 2 was published under the Rockstar brand.

20.     Sam Houser, who was named President of Rockstar, was the credited executive producer of GTA 1 and GTA 2.  Mr. Benzies did not work on either game.

21.    GTA 1 and GTA 2 received fairly average, but far from exceptional, Metacritic scores of 68 and 70 respectively.[2]

22.    These disappointing scores translated into unexceptional sales, by videogame standards, of 2,000,000 units for GTA 1 and 1,000,000 for GTA 2.

---

[1] The first game in the GTA series was titled "Grand Theft Auto."   To avoid confusion in this Complaint, the first GTA game is referred to as "GTA 1."

[2] Metacritic, found online at www.metacritic.com, is an aggregator of top critics' reviews of music albums, video games, movies, television programs, and DVDs.  Metacritic assigns these aggregations a numeric mark on a scale of 0 to 100.

23.     DMA was acquired by Rockstar Games in 1999.  In or around 1999, Mr. Benzies and his DMA colleague Aaron Garbut began working on a prototype of a Godzilla-type game.  Recognizing that many of the game's innovations were better suited for GTA 3, they ceased development of the Godzilla-style game and moved their innovations into the development of GTA 3.

## GTA 3

24.     Mr. Benzies thereafter became, and was to remain, one of the main creative forces behind GTA 3, its sudden popularity, its resulting revenues, and the franchise's sustained popularity over time.  Mr. Benzies had substantial control over all key phases of game development and design, specifically:

a.   *Design:*  Mr. Benzies was largely responsible for creating the Design Plan and Game Flow Chart for GTA 3.  These were the core documents upon which the entirety of GTA 3 and all subsequent games in the GTA franchise were built.  The Design Plan was essentially the architectural drawings and the Game Flow Chart the blueprints upon which GTA 3 was constructed.  Mr. Garbut designed the complex worlds of GTA 3 and its progeny while Mr. Benzies concentrated on the revolutionary design and production that would mark the entire series.   By comparison, Sam Houser and Dan Houser made no contribution to the Design Plan and no quantifiable contribution to the Game Flow Chart for GTA 3.

b.   *Coding:*  Mr. Benzies is the only "Rockstar Principal" with a technical background in coding, which is what makes computers and video games function.  The designers provide the computer coders or programmers with a desired outcome, who in turn draft and implement the commands necessary to achieve that

6

outcome.  Coding creates the software that operates the computer.  GTA 3 required millions of lines of code for the vast variety of activities within the game to function, such as the behavior of digital people in the game, variable weather patterns in the in-game environment, and the physics governing how virtual automobiles interact with virtual city streets.  Mr. Benzies, together with Obbe Vermeij[1] and Adam Fowler, oversaw and managed the technical aspects of GTA franchise coding from GTA 3 onward.  Their individual work was later supplemented by larger teams in subsequent entries in the franchise when the games grew even larger in scope.  Even then, Mr. Benzies continued to be responsible for general oversight.

c.  *Art:*  For all site design work, which was primarily the responsibility of Mr. Garbut, Mr. Benzies supported and oversaw the implementation of schedules for the art department and the related processes necessary to ensure that all work remained on target and on schedule.

d.  *Missions:*  All versions of GTA 3 and subsequent iterations involved a "story," a narrative into which the player inserts him or herself, becoming part of an active world that the player then manipulates through the game peripherals (*i.e.,* joystick, keyboard or mouse).  Mr. Benzies oversaw the design and development necessary to ensure that the game design effectively told the story and that the missions were playable and engaging.  Dan Houser created the story and

---

[1] Mr. Vermeij left Rockstar in 2009.  All references to his contribution are pre-2009 only.

contributed to the script for each GTA game, except GTA 3, which was handled by Paul Kurowski and James Worral.

e. *Quality control and production approval:* Mr. Benzies was largely the final quality control check for all aspects of game development. Quality control ensured that the game functioned smoothly with a consistent "look and feel" throughout. This involved eliminating glitches and ensuring that all aspects of the game worked with every other part.

25.    GTA 3 was revolutionary when compared to its predecessors in the GTA series and other video games in general. Its 3D visuals were designed to be sharp yet fluid, its extensive main storyline could take 20 or more hours to complete, and optional missions were available for even more gameplay hours. GTA 3 also gave the player the ability to freely explore a large-scale likeness of New York City ("Liberty City" in the game, with other cities to follow in later game iterations). The DMA team created the following key new game features:

a. *Camera placement.* The camera view in GTA 3 moved from the overhead 2D view of GTA 1 and 2, to 3D street level on the player's visual plane. Players could no longer see behind themselves or around obstructions as they could with the 2D overhead view. This innovation made the city seem more realistic and dangerous as threats could now lurk in unseen places.

b. *Narrative.* In all GTA games, the player must complete assignments or "jobs" to move forward in the game. GTA 3 was different from its predecessors in that it brought a strong overarching narrative framework connecting the individual jobs together and allowed the player to affect the overall storyline based on the jobs

8

they accept and complete.  Moreover, these jobs now had game-play justification and relevance within the story, making the overall narrative more cohesive.

c.  *Reality.*  Within the game, the virtual city of GTA 3 was much more realistic and fluid than a typical video game world.  Pedestrians and cars were only able to perform sensible actions at sensible times giving the player a heightened sense of reality.

d.  *Physics and 3D*.  All movable objects within the game were newly modelled in 3D with real physics, changing the physicality of everything in the city.  The player could interact with many more objects than in previous games to accomplish mission goals, which made GTA 3 more enjoyable because players had the opportunity to interact more with the world around them.

e.  *Emotion.*  GTA 3 was different from earlier entries in the franchise in that it included well-developed characters with backstories.  These characters brought the player further into the game, increasing their emotional connection to the story.

f.  *Power.*  GTA 3 included assisted weapon targeting, which empowered the player with a greater sense of control in firefights.  Targeting by the player was no longer necessary, which gave players an increased sense of in-game success.

g.  *Sophistication.*  GTA 3 had a far more serious tone than GTA 1 and 2.  Gone was the 'cartoony' look, replaced by a dark and more edgy appearance.  Action became far more dramatic with explosions and movements emphasized.  Childish "potty" humor from the earlier games was replaced by a more hard-boiled mature style.

9

h. *Time.* In-game passage of time reflected by day-night cycles was introduced, giving the player another level of realism. For example, some of the player's jobs can only be performed at night, when the whole complexion of the virtual city changes: business-like by day, gang elements by night. Time of day also dictated events.

26. As a direct result of these and other innovations, GTA 3 sold over 25,000,000 units and received a near-perfect Metacritic score of 97, eclipsing GTA 1 and 2 (which were executive produced by Sam Houser without Mr. Benzies). GTA 3 revolutionized gaming, and today hundreds of non-Rockstar game series borrow directly from GTA 3's distinctive new game play and themes, including such noteworthy franchises as Assassin's Creed, Saints Row, Far Cry, and Infamous.

27. As is reflected in the Design Plan and Game Flow Chart for GTA 3, it was Mr. Benzies, assisted and supported by Messrs. Garbut, Vermeij, Fowler and their team, that developed and created all of the industry-altering innovations that took GTA from being a game with sales in decline – a downward trend of fifty percent between GTA 1 and GTA 2 – to the most popular video game in the world.

28. Sam and Dan Houser had their respective functions within the company and in the overall process that eventually presented and marketed a finished game to the public. Starting with GTA 3 and throughout successive versions of the game, Sam Houser, Dan Houser, and Mr. Benzies had a stable, collegial, loyal, and well-developed working partnership between the three of them, each contributing to the successful whole in their respective ways. However, while expert in their respective contributions, Sam Houser and Dan Houser did not help invent, create, or develop any of the paradigm-shifting game

10

development, design, and artistic innovations in GTA 3 that so dramatically elevated the GTA franchise.

29.    Following the wildly successful introduction of GTA 3, Mr. Benzies was named president of Rockstar North.  Subsequent GTA game iterations such as GTA Vice City, GTA San Andreas, GTA 4, GTA 5, and Grand Theft Auto Online were developed, introducing still more innovations.  Messrs. Benzies, Garbut, Fowler, and Vermeij continued to push the technical boundaries of video game development and design, with Mr. Benzies ultimately leading a team of over 900 professionals around the globe who, with each subsequent launch, enabled unprecedented sales and revenue success.  From GTA Vice City onward, Sam Houser's and Dan Houser's roles were limited to developing the story and characters in the games and blending thematic elements from film and television aimed at mature audiences, such as Miami Vice, Carlito's Way, and Heat.

30.    Critical to advancing the GTA franchise were techniques Mr. Benzies developed to maximize efficiency in design and development.  Previously, the progress of design and development was tracked using such low-tech aids as white-boards and post-it notes.  Mr. Benzies realized an innovation was necessary to take gaming development itself into the computer age.  Among Mr. Benzies' achievements in this regard was his creation of the task management and work-flow software program "Bugstar," uniquely his and brought to maximum effect on the design and development of later games in the GTA series.

31.    Bugstar enabled far greater efficiency than had ever been possible in managing game development, identifying and eliminating bugs/tasks, and in every conceivable way enabling comprehensive management of game development and design.

11

Bugstar entirely computerized the process, allowing for efficient game design task assignment and management, and real-time assessment of personnel efficiency and deficiency.

32.     Mr. Benzies' innovations allowed Rockstar to design and develop far larger games than any other video game maker, with greater complexity, more detail, more player tools and toys, and, as a result, longer play times.  Only someone with Mr. Benzies' background in production, gaming, and programming could have created the revolutionary technology, game design, coding, efficiency, and related systems that took the GTA franchise to its current level.  Sam Houser and Dan Houser both lack that background, and as a result were incapable of guiding GTA to the level that Mr. Benzies and his team enabled and designed it to reach.

33.     GTA 3 and subsequent games in the series carried Defendants to revenue never before seen in the video game industry.  Following the success of GTA 3, Grand Theft Auto Vice City sold approximately 25,000,000 units, Grand Theft Auto San Andreas approximately 30,000,000 units and Grand Theft Auto IV approximately 25,000,000 units. This fulfilled Mr. Benzies' overall goal: *to make ground-breaking games through relentless innovation*, which resulted in increased shareholder value.

34.     Defendants primarily profited from these successes – the Housers through bonuses and royalties and the entities through sales profits.  Mr. Benzies and the Rockstar North team, largely responsible for these sales figures, initially received comparatively minor bonuses.  Recognizing that Mr. Benzies and his team were critical to the franchise's continuing success, Take-Two implemented the "2006 Royalty Plan" by which they

12

received fixed and guaranteed per-game-sold royalties on subsequent games such as GTA Vice City, GTA San Andreas, and GTA IV.

**Mr. Benzies' Role As Troubleshooter**

35.    In addition to responsibility for Rockstar North and global game design, Mr. Benzies was also Rockstar's troubleshooter on non-GTA games, substantially responsible for resurrecting and turning around a number of troubled projects.  Some, such as Red Dead Redemption, were created by Rockstar itself, while others were created by third-party developers.  These projects were previously overseen by the Housers, but had flailed for over six years.

36.    As Sam Houser himself recognized, the Houser brothers were incapable of completing large and complex games without Mr. Benzies' oversight, management and skill in taking unwieldy designs and making an understandable, cohesive, and enjoyable game.  For example, Sam and Dan Houser took the lead on the development of Rockstar's game Red Dead Redemption.  Mr. Benzies had no assigned position on the game.  As the game's delivery date grew near, Sam Houser urgently reached out to Mr. Benzies in an October 22, 2009 e-mail, writing, "The ups and downs are VERY extreme.  We have to fix this.  Quickly.  Help!  I'm freaking!"  As Sam Houser reviewed more of the game that he had overseen for many years, he became more desperate writing to Mr. Benzies the very next day, "This [RDR] is a (recurring) nightmare.  But one i/we need to get out of.  I have problems with the camera all over the place.  So much so, that I can't be rational or specific about it.  The darkness!!!"  As reflected in his October 24, 2009 e-mail to Mr. Benzies, Sam Houser's desperation was escalating, "PLEASE help me/us get rdr [Read Dead Redemption] into shape.  I am a jabbering wreck right now.  I need The Benz!"  Once Mr.

13

Benzies intervened, the game was finished within a few months, complete and ready for presentation to external publishers such as Sony and Microsoft.

37.    Mr. Benzies has been widely recognized for his contributions to video-gaming.  While Mr. Benzies and the Housers were all equally committed to the believability of the worlds created by the videogames, it was Mr. Benzies who largely led Rockstar in project design and in the implementation of ideas, based in part on storylines developed by Dan Houser.  Mr. Benzies' lead role is established by Bugstar's objective measurement metrics.  For example, while Mr. Benzies had a Bugstar access account in support of his design and development work, Sam Houser had no account.  During one period, Mr. Benzies *alone* added and/or detected 15,000 GTA 4 development tasks using Bugstar, while the whole of the New York Rockstar office (where the Housers and several other executives were located) detected 1,000 *in total*.

**Growth of the GTA Franchise**

38.    GTA 5 was released in September 2013, with versions for next-generation videogame systems or "platforms" released over the following year.

39.    GTA 5 impressed critics and broke sales records, receiving a Metacritic score of 97, which the site categorizes as "universal acclaim."  Within 24 hours of release, it generated more than $800,000,000 in worldwide revenue, nearly double the analysts' expectations for the title.  Three days after release, GTA 5 surpassed $1,000,000,000 in sales, making it the fastest selling entertainment product in history.  It broke seven Guinness World Records: best-selling video game in 24 hours; best-selling action-adventure video game in 24 hours; highest grossing video game in 24 hours; fastest entertainment property to gross $1 billion; fastest video game to gross $1 billion; highest

14

revenue generated by an entertainment product in 24 hours; and most viewed trailer for an action-adventure video game.  According to *Forbes* magazine, as of May 2014 GTA 5 had generated over $1,980,000,000 in revenue.  Just one year later, Take-Two revealed in its 2015 annual report that over 60,000,000 copies had been shipped across all game platforms, meaning that revenue for GTA 5 alone approaches or exceeds an estimated $3,000,000,000.  By this time, the GTA franchise had become the largest, most popular video game in the world, and in the history of gaming, creating unprecedented company revenue and adding significantly to shareholder value.

40.     Revenues from GTA 5 also funded the first significant profit-sharing distribution to the Rockstar Principals under the 2009 Royalty Plan.

**GTA Online**

41.     Simultaneous with the development and release of GTA 5, Mr. Benzies managed and oversaw the development of GTA Online.  An extensive add-on to the GTA 5 game, GTA Online opened up the format of GTA 5 to numerous users at the same time via internet connection, allowing players to interact in vehicle races, group missions, and free exploration and socializing through their online identities or "avatars."

42.     As he had done years earlier when he created the Design Plan for GTA 3, Mr. Benzies created a revolutionary Design Plan for GTA Online integrating the complexities of a massive multi-player environment, while maintaining the integrity of the game and the player experience.  GTA Online has the potential to achieve the greatest profit margin of any game created in the GTA franchise.  In November 2015, Take-Two CEO Strauss Zelnick announced that two years after its initial release, nearly 8,000,000 people were still playing GTA Online each week.  GTA Online has generated at least

15

$500,000,000 in revenue, based in part on a significant cash-generating tool contained in the game.  GTA Online is particularly noteworthy in that it has its own "economy," in which online goods can be purchased using virtual "currency."  Real cash is used to purchase virtual currency, which can in turn be spent on virtual goods and services.  These purchases have a nearly 100% profit margin, subject only to nominal development costs and app store commissions.

43.    The Houser brothers had little interest in GTA Online, and did not focus on its development, all as reflected in Bugstar.

**The "Rockstar Principals"**

44.    Among the Rockstar Principals, Sam Houser primarily handled business matters, including negotiations with Take-Two and outside entities, while consistently deferring to Mr. Benzies on game design and project management.  Sam Houser consistently affirmed his belief in this  division of labor, stating that the game makers and designers – Mr. Benzies and his Rockstar North team – should be kept in a "bubble," separated from the distractions of business.  The "business" of the game industry had become Sam Houser's main concern and responsibility.

45.    In the course of their business relationship, Sam Houser, Dan Houser, and Mr. Benzies became close friends as well as business partners, as Sam Houser repeatedly emphasized.  For example, on August 8, 2011 Sam Houser wrote to Mr. Benzies: "Thanks man! So grateful to have you as my partner!"  In July, 2011 he shared the following with Mr. Benzies: "As ever, I feel so fortunate to have you as a friend and a partner." Communications and assurances like these were consistent and unambiguous, spanning nearly a decade.

16

46.     Mr. Benzies' personal and professional relationships with Sam Houser and Dan Houser continued to develop.  Sam Houser named Mr. Benzies as his son's Godfather. Based on this close familial-type relationship between self-described business partners, Mr. Benzies relied on Sam Houser in connection with key documents and important decisions relating to the business of Rockstar and his place within it.  Just as Sam Houser depended on Mr. Benzies for game development in the "bubble," Mr. Benzies trusted Sam Houser to be honest and loyal in his professional interactions with him on the business side of the Rockstar Principals' relationship, a dependence Sam Houser deliberately cultivated, and which grew in scope and depth over time, up to and including the drafting, negotiation and execution of the 2009 Royalty Plan.

**2009 Royalty Plan:  Rockstar Principals' Equal Profit-Sharing**

47.     Following the record-breaking success of GTA 3, GTA Vice City, GTA San Andreas and GTA 4, Sam Houser, Dan Houser and Mr. Benzies had the collective leverage to increase the percentage of profits that they would collectively receive from future games in the franchise, and beyond.  The result of that collective leverage was the 2009 Royalty Plan, which **clearly** defined Sam Houser, Dan Houser and Mr. Benzies collectively as the "Rockstar Principals" – a privileged, connected and financially equal group of three.

48.     Though titled a "Royalty Plan," the agreement was actually designed to distribute to the Rockstar Principals their shares of company profits.  At the same time the 2009 Royalty Plan was executed, Take-Two and the Rockstar Principals created Another Game Company LP ("AGC"), an entity with royalty-free rights to Rockstar intellectual

17

property and potentially hundreds of millions in Take-Two profits, which had only three equal limited partners – Sam Houser, Dan Houser and Mr. Benzies.

**Sam Houser's Lead Position in Negotiations For His Fiduciary Leslie Benzies**

49.    Early in the negotiation of the Rockstar Principals' suite of agreements with Take-Two (including, without limitation, the AGC agreements, Royalty Plan, stock option plans and employment agreements), Sam Houser advised Mr. Benzies that he (Mr. Houser) was actually overseeing preparation of these agreements, and that Sam would serve as the sole contact and liaison with Rockstar Head of Finance and Corporate Development Rowan Hajaj and Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul Weiss"), the law firm retained by Rockstar to represent the Rockstar Principals jointly and individually.  Mr. Benzies reasonably trusted and relied on his partner, fiduciary and – when the agreements finally arrived – his co-Principal Sam Houser to be the exclusive negotiator and point of contact for him and for the Rockstar Principals.  As the only "Rockstar Principals" in the company, Mr. Benzies and the Housers were members of a highly compensated, specially acknowledged and exclusive group of three financially equal principals.

50.    Sam Houser's communications to Mr. Benzies during the negotiation of the 2009 Royalty Plan and related agreements were intended to induce deep trust.  For example, on August 13, 2008 – in the middle of the negotiation of the 2009 Royalty Plan – Sam Houser wrote to Mr. Benzies with respect to the Royalty Plan: "You know I will do everything in my power to deliver the right situation for everyone.  I won't stop until we have it."

51.    Retention of Paul, Weiss was further indication that the Rockstar Principals had co-equal financial rights, since there were no disclosures by company, firm or Sam

Houser that any Rockstar Principal's financial interest was different or less than that of any other Rockstar Principal. The Royalty Plan further used special fonts to generally denote their equality, emphasizing and specially defining the words "Rockstar Principals." The Royalty Plan also used other techniques to call attention to agreement features most consistent with complete partner financial equality and the resulting fiduciary status between the Principals. Additionally, the Rockstar Principals' 2008 employment agreements with Rockstar were separate but nearly identical, and the charts sent to Mr. Benzies explaining the AGC corporate structure listed them as equal owners – both serving as further evidence of the Housers' and Mr. Benzies' co-equal status.

52.   AGC was created by the Rockstar Principals to allow them to be able to leave Take-Two, and collectively launch a new independent company, with favorable economic and IP-based rights stemming in large part from Take-Two and Rockstar. The Rockstar Principals would collectively enjoy royalty-free rights to use certain Rockstar and Take-Two intellectual property, and financing arising from the Royalty Plan.

53.   In charts and graphs sent to Mr. Benzies by Sam Houser and Mr. Hajaj, the breakdown of the Rockstar Principal's ownership and economic interests was straightforward and clear: 33% to Sam Houser, 33% to Dan Houser, and 33% to Mr. Benzies.

54.   Sam Houser led all negotiations for the Rockstar Principals with respect to both the AGC set of founding agreements and the Royalty Plan. Mr. Benzies had no role in negotiations. Sam Houser repeatedly assured him that he did not need to take any role, since Mr. Houser was ensuring that his interests would be protected and, by virtue of Mr. Houser's constant proclamations, that his financial rights would remain equal to his own.

19

This was borne out by performance under the 2009 Royalty Plan as the Rockstar Principals each received identical profit shares through 2014.  This was also consistent with the manner in which the AGC documents, between just the Rockstar Principals, were drawn, creating equal shares there too.

55.     Sam Houser liaised with Mr. Hajaj and Paul Weiss, and concluded all deal terms, without ever seeking Mr. Benzies' approval or input -- all, he said, to relieve Mr. Benzies of the chore and burden of doing so.  "Don't worry, Les, I've got it" was Sam Houser's typical response whenever Mr. Benzies inquired about the progress of deal negotiations. In one exemplary response to Mr. Benzies' inquiry, Mr. Houser wrote, "I've got your back."

56.     Just prior to Mr. Benzies' execution of the 2009 Royalty Plan and related agreements, he thanked Sam Houser for "looking after me," to which Houser responded: "It's always a pleasure to look out for you.  Love, Sam."  In response to Sam Houser repeatedly writing that he and Leslie were "partners forever," Mr. Benzies believed and unconditionally trusted him, a sentiment that Sam Houser worked hard to cultivate, routinely signing in closing, "Love, Sam."

57.     Based on Sam Houser's actions in assuming responsibility for negotiating on behalf of the Rockstar Principals, as well as his numerous and repeated statements to the effect that he was looking after Mr. Benzies' interests, Mr. Benzies reasonably believed that he would be treated equally to the two other Rockstar Principals with respect to royalty payments.

58.     The 2009 Royalty Plan, the AGC agreements, and Mr. Benzies' and the Housers' employment agreements were signed on December 12, 2008.  A third Amended

20

and Restated Employment Agreement was signed on September 12, 2012.  The AGC equal ownership structure and its relationship to the Royalty Plan and the Rockstar Principals' employment agreements are further specific indications of united interests, equal compensation, and shared strategic and creative goals between the Rockstar Principals.

59.     While the 2009 Royalty Plan was structured to create the appearance that the Rockstar Principals were to be treated financially as equals, Take-Two, Rockstar and Sam Houser now take the position that it does not.  Defendants have corrupted the 2009 Royalty Plan to place Mr. Benzies into a grossly disadvantaged position by denying Mr. Benzies any profit-sharing at all.  Yet, in presenting the Royalty Plan to Mr. Benzies for signature, Rockstar, Take-Two, the Housers, and Paul Weiss never directly or indirectly advised that Sam Houser (or anyone) could claim to have the power to use the Royalty Plan to *deny* Mr. Benzies his profit-sharing rights.

60.     While the 2009 Royalty Plan and AGC agreements were in formation in New York, Mr. Benzies in Scotland continued to receive multiple e-mails regarding them from Sam Houser; most signed "Love, Sam."  He received no substantive communications of any kind from Take-Two or Paul Weiss attorneys.  None advised that Mr. Benzies may actually receive no profit-sharing, which would have been an extreme deviation from Mr. Benzies' prior bonus rights, which were guaranteed.  Defendants could not reasonably believe that Mr. Benzies would sign away guaranteed bonuses for "profit-sharing" that could be manipulated to give him nothing at all.

61.     The haste with which Mr. Benzies was asked to sign these agreements reflects a comprehensive deception.  Sam Houser ordered Mr. Hajaj to fly to Scotland to present the 800 pages of documents to Mr. Benzies for review and signature, giving Mr.

Benzies only 45 minutes to sign the entire set, while Mr. Hajaj waited to retrieve them post-signature for his immediate same-day return to New York.  Relying on Sam Houser's constant assurances, all signed "Love, Sam", and in the absence of any objections by, or warnings from, his own attorneys at Paul Weiss, Mr. Benzies concluded that he could rely on Sam Houser to negotiate what Mr. Houser said he was negotiating for Mr. Benzies.

62.     As to Paul Weiss, it represented Rockstar as well as the three Principals *individually*, and the three Principals *collectively* – violating various ethical canons.  For his part, Sam Houser, as the sole point of contact, via Rowan Hajaj, with Paul Weiss on behalf of the Rockstar Principals, arranged, facilitated and abetted this.  In Mr. Benzies' single (30-minute) meeting with Paul Weiss, he was not advised that he could receive no profits under the Royalty Plan, or that one Rockstar Principal could be treated differently than any other Rockstar Principal with respect to royalties.  Mr. Benzies trusted that his lawyers at Paul Weiss had drafted, and that his friend and partner Sam Houser had negotiated, an agreement that would protect and compensate him, Sam Houser and Dan Houser equally.

63.     After Mr. Benzies signed, Sam Houser sent Mr. Benzies a follow-up email, re-affirming his loyalty to Mr. Benzies:  "Hey man, All cool with the Hajaj?  How do you feel??? Just signed your life over to the psycho for another few years?  Or excited about total domination?  Or both?  I'm excited – and scared.  Time to stick the hammer down on it all and destroy!!!  We have a lot to do.  On so many levels.  Let's do this.  Partners for real this time!!! I think this is incredible.  We've spoken about it for so long, but now we've made it happen.  Awesome!!! True family.  So unique and special.  We'll never look back. Let's make sure of it.  Fingers crossed.  Love, Sam."

64.    Mr. Benzies responded and received a further message from Sam Houser: "Dan and I are so proud to be partners with you. Feels very real and very right. We've wanted this for so long and we've finally made it happen. It's a glorious thing! Love, Sam." If Sam Houser at this time knew and believed that the 2009 Royalty Plan and related documents gave him the right to *deny* Mr. Benzies his share of profits, then assurances containing terms of endearment this extreme are axiomatic characteristics of a deliberate, calculated fraud.  If Sam Houser did not believe he had reserved that right, and that his proclamations of partnership were true and genuine then he cannot now claim something he did not intend at that time. Furthermore, as self-proclaimed partner and fiduciary, Sam Houser's actual obligation was to treat each Rockstar Principal equally.

65.    Under the 2009 Royalty Plan, Sam Houser was to represent the interests of the Rockstar Principals, and particularly Mr. Benzies since he was the only one of the three Rockstar Principals who did not serve on the 2009 Royalty Plan's so-called "Allocation Committee."  Sam Houser apparently unilaterally appointed himself to direct all activity of the Allocation Committee.  This meant that as to his fellow Rockstar Principals, and particularly Mr. Benzies, he was required to ensure that required protocols for the calculation of profit shares were adhered to in the creation of the so-called "royalty pool" (the profit-sharing pool), which would then be distributed in accordance with the Rockstar Principals' co-equal shares.  Sam Houser as fiduciary was required to act as to each partner and Rockstar Principal equally and he proceeded to do so from the outset and continued to do so for a period of five years.  Under the AGC limited partnership agreement, eventual proceeds were also to be divided equally (though the entity eventually remained largely dormant).  As a result, therefore, as to this entire suite of agreements, Sam Houser became

23

Mr. Benzies' trusted fiduciary with concomitantly expanded obligations of fealty and loyalty, whether as a partner, a much-beloved friend, or as someone who repeatedly promised he was acting solely for the benefit of each Rockstar Principal.

**Rockstar Principals' Co-Equal Rights to Profit-Sharing**

66.     Whether fraudulent at the time of execution, or not intended at the time of execution, the 2009 Royalty Plan's multiple affirmations of the Rockstar Principals' co-equal rights to profit sharing, together with the absence of any explicit provisions giving the Allocation Committee discretion to discriminate between the Rockstar Principals cannot be reconciled with the provisions which the Defendants now claim provided unfettered authority to withhold profit-sharing payments from Mr. Benzies.  For example, the "Allocation Committee" (comprised of two Rockstar Principals, and one Take-Two appointee) appears to have a strictly ministerial role as to the "Rockstar Principals" – to pay the Rockstar Principals their shares of profits.  The *fact* of a profit distribution is explicit in the phrasing.  There is no provision distinguishing between the Rockstar Principals and no provision allowing the Allocation Committee to *withhold* profit shares from any Rockstar Principal – whether Mr. Benzies or either of the Housers.  Though Sam Houser and Dan Houser, through methods that are unclear and that were never disclosed to Mr. Benzies, apparently appointed themselves as the Rockstar Principals' representatives on the Allocation Committee, this would give Mr. Benzies no reason for alarm, since he was to be treated equally and there is nothing in the Royalty Plan to say that he would not be.  In actual implementation, all profit distributions to Rockstar Principals were, in fact, identical through 2014, a six-year pattern.  During this entire period, neither Sam Houser nor Dan Houser ever informed Mr. Benzies of the opportunity to participate on the Allocation

24

Committee, an exclusion that imposed on the other two Rockstar Principals even more heightened duties of trust, confidence, loyalty and fealty.

67.     Neither the companies nor the Housers can plausibly maintain that any of them had the right to deny Mr. Benzies, and Mr. Benzies alone, co-equal profit shares. This is particularly so in light of the fact that they were jointly represented by the same counsel in the agreement, that no disclosures of inequality were ever made either before or after execution of the 2009 Royalty Plan, and in actual practice the Plan operated to disburse exactly equal profit shares to the Rockstar Principals.  This was the fulfillment of Sam Houser's proclamation of love for and fealty to his partner Mr. Benzies, and his insistence over time that Mr. Benzies view him as worthy of his trust.

**Abrupt and Unannounced End of Mr. Benzies' Profit-Sharing**

68.     In 2014, the Housers forced an abrupt and unannounced end to Mr. Benzies' profit-sharing payments, without notice or warning, and without reference to exactly where they or the companies obtained this authority.  Mr. Benzies received only a simple message from an executive vice-president at Rockstar:  "Sam thinks you've had enough."

69.     In late 2013, Mr. Benzies had placed his name last in GTA Online's opening credits.  In previous GTA installments, Sam Houser's name was last.  In gaming, the last position denotes the person deemed the most significant contributor to the particular game.  Sam Houser had actually placed his name last by fiat, not by actual achievement in game development.  As to GTA Online, the first not to list Sam Houser last, he claimed to have noticed it only after it had already been released.  If true, this would mean that he had not played or even viewed the game pre-release – or else he would have

seen the opening credits.  Jennifer Kolbe, a Rockstar Vice President, and administrative liaison between Sam Houser in New York and Mr. Benzies in Scotland, reported Sam Houser's unhappiness, quoting him as saying that Mr. Benzies "wanted to take over the company."

**The Sabbatical**

70.     On July 29, 2014, Sam Houser invited Mr. Benzies to fly from Los Angeles to New York.  Ms. Kolbe picked up Mr. Benzies at the airport and met with him for a period of hours.  Ms. Kolbe suggested that Mr. Benzies take some "personal time."  Mr. Benzies agreed, understanding that there were no urgent game deliverables, allowing him time to devote to family matters.  Ms. Kolbe offered assurances stating that "this is why we work so hard," "we've all afforded ourselves time-off when needed," and "there's nothing in the pipeline right now requiring time on the job."

71.     On August 15, 2014, Mr. Benzies and Daniel Emerson (a "director" for Rockstar North) signed a two-page letter that formalized Mr. Benzies' time off – formally termed a "sabbatical" (the "Sabbatical Agreement").  Under the Sabbatical Agreement, Mr. Benzies' Employment Agreement would remain in force, but Mr. Benzies would receive paid time off from September 1, 2014 through March 31, 2014 (*sic*) (scrivener's error corrected to 2015).  Under the Sabbatical Agreement, Mr. Benzies would be excused from all job responsibilities, but all pay and benefits would be continued, without exception.

72.     The Sabbatical Agreement was drafted to ensure that Mr. Benzies viewed the sabbatical as mutually beneficial time away from the office:  "The Company [Rockstar North Ltd.] greatly appreciates your dedication to its business and products, and this

26

Sabbatical is meant to provide you with an opportunity to re-focus those energies away from the Company and to yourself for the period of time described below."

**Denial of Royalties, Attempted Return, and Ouster**

73.     It soon became clear to Mr. Benzies that the "sabbatical" was actually an expulsion – the commencement of Defendants' campaign to oust Mr. Benzies.  By September 2014, Sam Houser had ceased all communications with Mr. Benzies.  Mr. Benzies' company Blackberry was remotely disabled without notice and his company email account was locked, over Mr. Benzies' objections.  Mr. Benzies requested access to the account during the sabbatical, which was wholly rejected.

74.     During Mr. Benzies' sabbatical, Sam Houser terminated or forced-out some of Mr. Benzies' key support staff.  Mr. Benzies was not consulted about those decisions or any other business decisions during his sabbatical.

75.     During the sabbatical, Mr. Benzies had infrequent contact with Rockstar through Ms. Kolbe.  He was not allowed to speak with any other colleagues at Rockstar, and was not allowed access to any data.  Long-time colleague Andy Semple refused to meet with him.  Mr. Benzies was now completely cut-off, including from colleagues he had worked with for up to twenty years.

76.     While Mr. Benzies was on his sabbatical and through the date of this Complaint, Sam Houser and Dan Houser (through the "Allocation Committee" comprised of the Housers, and one Take-Two representative) awarded themselves at least $93,000,000 in profit sharing distributions derived from the exploitation of GTA 5, and potentially as much as $523,000,000.  During that period, Sam Houser awarded Mr. Benzies no shared profits, a violation of the 2009 Royalty Plan, his own fiduciary duty to

27

Mr. Benzies, and the long-standing actual practice of treating the Rockstar Principals identically with respect to royalties.  Mr. Benzies also failed to receive quarterly reports describing the "royalty pool" (as was his contractual right, and Take-Two's contractual obligation, under the 2009 Royalty Plan), until March 2015.  He received no notice that any Plan profit shares were distributed to his fellow Rockstar Principals.

77.     Terminating distribution of Mr. Benzies' profit shares also violated the Sabbatical Agreement, which explicitly stated that Mr. Benzies would lose *no* pay or benefits while on sabbatical.  There was no carve-out for 2009 Royalty Plan profit-sharing.

78.     Actual distributions to the Rockstar Principals show long-standing compliance with Sam Houser's promises of equality, and then the abrupt termination of payments during the Sabbatical Agreement (and since then):

| | Profit-sharing disbursements | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Prior to Sabbatical commencement | | | | | | | | After Sabbatical commencement | |
| DATE | Q2-Q4 | Aug. 2010 | Dec. 2010 | July 2011 | Dec. 2011 | July 2012 | Dec. 2013 | May 2014 | Dec. 2014 | Aug. 2015 |
| BENZIES | Equal | Equal | Equal | Equal | Equal | Equal | Equal | Equal | 0 | 0 |
| HOUSER, S | Equal | Equal | Equal | Equal | Equal | Equal | Equal | Equal | 6,500,000 | 40,000,000 |
| HOUSER, D | Equal | Equal | Equal | Equal | Equal | Equal | Equal | Equal | 6,500,000 | 40,000,000 |

79.     It was in or around February 2015, when Mr. Benzies e-mailed Ms. Kolbe to discuss and arrange logistics for his scheduled return from sabbatical, that she stated for the first time that Rockstar (*i.e.*, Sam Houser and Dan Houser) did not want Mr. Benzies to return.  Ms. Kolbe suggested that Mr. Benzies' lawyer speak with Adam Turteltaub, outside retained counsel for Take-Two, and a partner at the firm Willkie Farr & Gallagher LLP.  Mr. Benzies retained his own separate counsel to assist him with the developing problem concerning his royalties and return to Rockstar North.

28

80.     Mr. Turteltaub communicated Rockstar's "severance" proposal – Mr. Benzies would be permitted to remain on sabbatical through the end of 2015, with salary and vesting of equity during that time, but no "royalties" under the 2009 Royalty Plan.  The total value of the offer was approximately $1,700,000.  This is in contrast to the amount in the "royalty pool" of possibly more than $523,000,000.  While Mr. Benzies, through counsel, requested and received some documents necessary to formulate a response, Rockstar continued to deny Mr. Benzies access to quarterly reports and other documents, including agreements referenced and/or superseded by the 2009 Royalty Plan.

81.     As neither Take-Two nor Rockstar had issued any notice of termination or discharge, Mr. Benzies began preparing to resume his duties in anticipation of his April 1, 2015 return to work.  He requested that his email access be restored, that meetings with the other Rockstar Principals and key Take-Two executives be scheduled, and that he receive status reports on certain employees, particularly those who left while he was on sabbatical.

82.     Instead of facilitating responses to these requests, and inconsistent with Mr. Benzies' Sabbatical Agreement's specific ending date of April 1, 2015, Ms. Kolbe and Sam Houser traveled to Edinburgh to purportedly survey Rockstar North employees about Mr. Benzies' return.  On information and belief, Ms. Kolbe and Sam Houser used the "survey" to make statements to Rockstar North managers and employees (and attempted to elicit statements from those managers and employees) intended to undercut and complicate Mr. Benzies' ability to return to Rockstar North.

83.     Deirdre Hykal replaced Mr. Turteltaub as counsel for Take-Two.  A discharge or other termination notice still had not issued, and Ms. Hykal and Take-Two

29

(including Rockstar North) declined to state whether Mr. Benzies had been or was going to be discharged.  Mr. Benzies continued to advise he planned to return.

84.     On or about March 23, 2015, undersigned counsel wrote to counsel for Take-Two and again indicated Mr. Benzies was looking forward to his April 1, 2015 return to Rockstar North, further requesting that Rockstar take all actions consistent with the return of a chief executive, including that his reasonable requests be honored and that all other steps be taken to ensure a smooth, supportive and collegial return.

85.     On or about March 24, 2015, Ms. Hykal responded by stating only that Mr. Benzies was not to return to work on April 1, 2015, effectively terminating his employment.

86.     This was followed by an abrupt reversal when on March 26, 2015, Ms. Hykal sent Mr. Benzies' counsel notice purporting to *cancel* Mr. Benzies' termination.

87.     On March 27, 2015, just five days before Mr. Benzies was to return to work, Mr. Benzies' counsel again requested clarification from Ms. Hykal, specifically on whether Take-Two and Rockstar were terminating Mr. Benzies or were positioned to accept his contractual return to work at the conclusion of his sabbatical.  Ms. Hykal did not respond.

88.     On March 30, 2015, Mr. Benzies' counsel again wrote to Ms. Hykal and expressed that Mr. Benzies was ready, willing and able to return to work as contractually scheduled on April 1, 2015, less than two days away.  Mr. Benzies requested a simple "yes" or "no" response.  On March 31, 2015, Ms. Hykal responded, but did not provide clarification, or a "yes" or "no."  Mr. Benzies' counsel responded that Take-Two and Rockstar's counsel were creating deliberate ambiguity and advised that Mr. Benzies

30

planned to return to work at Rockstar North, in Edinburgh, the next day, April 1.   The only response was Ms. Kolbe's surprising, out-of-context, and unexplained request to meet Mr. Benzies at a hotel.

**Mr. Benzies' Attempt to Return and Notice of Termination**

89.     Mr. Benzies attempted to return.   He found his access credentials denied. The building guard recognized him and allowed access.   Mr. Benzies proceeded to Rockstar North's offices, and was met by the office manager who ordered Mr. Benzies to leave.   Mr. Benzies left.

90.     On April 2, 2015, Mr. Benzies' counsel sent Take-Two and Rockstar's counsel a letter entitled "Notice of Employee's Termination for Good Reason Pursuant to Sections 2 and 6 of Leslie Benzies' Amended and Restated Employment Agreement Dated as of September 12, 2012."   In that letter, Mr. Benzies' counsel explained that Mr. Benzies was terminating his employment for "good reason," and in the alternative stated that he had been terminated by Rockstar without Cause, as those terms are defined in Section 6 of the Employment Agreement.   The letter specifically stated that, "Mr. Benzies issues this notice on separate, independent, and alternative grounds under Section 6(d): (1) there has been "more than a *de minimis* diminution or other adverse change in the Employee's authority, duties, responsibilities, reporting relationship or position"; and/or (2) there has been a material breach of the Royalty Plan."

91.     Take-Two and Rockstar responded by making scurrilous allegations, a revenge tactic they had used before with other respected employees, this time deploying it against Mr. Benzies in an attempt to concoct false grounds for termination for Cause and to intimidate him into not pursuing his royalty claims.   Take-Two and Rockstar threatened to

31

use these false charges against Mr. Benzies if he continued to assert his rights. This was a shocking development given that Sam Houser himself had orchestrated and encouraged a company culture involving strip clubs, personal photography of employees in sexually compromising positions, and other conduct grossly in violation of standard workplace norms.

92.     The evidence does not support the threatened claims levied against Mr. Benzies by Rockstar and Take Two. For example, the Defendants threatened to justify Mr. Benzies' ouster by claiming that Mr. Benzies had caused undue delays in the GTA 5 and GTA Online development and delivery process by failing to properly perform his job duties. However, emails from Sam Houser directly contradict those false assertions.

a.   On December 19, 2013 (which followed the release of both GTA 5 and GTA Online), Sam Houser wrote to Mr. Benzies: "We're going to keep this world growing and building forever. Amazing opportunity on so many levels!"

b.   On December 23, 2013, Sam Houser wrote to Mr. Benzies: "Being together – you and me – not in a creepy way – is what goes through my mind …"

c.   On December 31, 2013, Sam Houser wrote to Mr. Benzies: "Thanks man! Hope you're having the most amazing time there!!! Let's start '14 where we left '13. Dominating!!! So excited for what lies ahead and to be in this with you. Fingers crossed. Happy New Year! Love from all of us in London. Sam."

d.   On January 1, 2014, Sam Houser wrote to Mr. Benzies: "Hey man, Happy New Year! Just let off some serious fireworks! Thanks again for everything this year. I'm so proud and honored to be your friend and comrade! Here's to together forever!!! Fingers crossed. Love, Sam."

32

e.  On March 13, 2014, Sam Houser wrote to Mr. Benzies: "Hope you're good?  Hope everyone a great night [*sic*].  I was so proud of everyone.  Thanks for being my partner and my friend.  We're going to keep dominating on whole new levels.  Right???  Fingers crossed.  Love, Sam."  Unaware of the impending wrongdoing by the Defendants, Mr. Benzies wrote back to Sam Houser, "Hey Sam, All is good.  That was a wonderful night.  Thank you too for being a friend and partner.  We've just started.  Love Leslie."  In response, Mr. Houser wrote:  "So amazing to experience that together.  Onwards and upwards forever.  Fingers crossed.  Love, Sam."

93.     Only months later, Sam Houser and the Defendants implemented their plan to oust Mr. Benzies.  This enabled the Housers to divert Royalty Pool profit shares that belonged to Mr. Benzies to themselves instead, making the Housers tens (if not hundreds) of millions of dollars richer.

**Mr. Benzies' Unpaid Profit Shares**

94.     Under the 2009 Royalty Plan, Take-Two reserves a Royalty Pool equal to 50% of Rockstar Net Operating Income (as defined in the Plan) for each fiscal quarter, for the purpose of compensating the Rockstar Principals and certain key employees.

95.     The 2009 Royalty Plan created the Allocation Committee to determine the allocation of profit-sharing, which was to be decided by majority vote.

96.     The 2009 Royalty Plan does not explicitly provide the Allocation Committee with absolute discretion, nor does it explicitly permit any one Rockstar Principal to be singled out and denied profit-sharing payments.  While the 2002 Royalty Plan did expressly provide for "sole and absolute discretion" in determining royalty

33

allocations, that language was not included in either the 2006 or 2009 Royalty Plans. This is because the 2009 Royalty Plan was actually designed to protect the Rockstar Principals against actions by Take-Two to deny them their shares of profits. It was never intended that the 2009 Royalty Plan could be used to justify inequality between the Rockstar Principals, or the denial of profit-sharing to just one Rockstar Principal.

97.     The 2009 Royalty Plan also does not specify how members of the Allocation Committee are selected from the Rockstar Principals or Take Two.

**2009 Royalty Plan:  Sam Houser Misuses Key Terms With Take-Two's Complicity**

98.     Sam Houser repeatedly stated that he negotiated the 2009 Royalty Plan to protect the Rockstar Principals against potential overreaching by Take-Two. This is reflected in provisions in the 2009 Royalty Plan detailing how Take-Two is required to calculate  the amounts to be placed in the Royalty Pool: baring Take-Two from taking certain actions that may reduce the Royalty Pool, requiring Take-Two to place Royalty Pool funds in a separate deposit account, requiring that Take-Two provide quarterly statements of the total Royalty Pool, affording Rockstar Principals with significant audit and inspection rights, and guaranteeing the Rockstar Principals' control over the Allocation Committee. Mr. Benzies has formally asserted his audit rights and an audit is pending. All dollar figures in this complaint are subject to re-calculation based on the audit results.

99.     During Mr. Benzies' sabbatical, Sam Houser grossly departed from both the letter and spirit of the 2009 Royalty Plan, and from past practice, by directing all profit share distributions to himself and his brother, Dan Houser, and nothing to Mr. Benzies. This violated the agreement, custom and practice, and his obligations as a fiduciary to Mr.

Benzies and as the self-appointed Rockstar co-Principal allegedly in charge of these distributions.

100.    Take-Two and Rockstar are complicit in Sam Houser's conduct.  Each had members on the Allocation Committee with knowledge of the improper actions being taken against Mr. Benzies.  In addition, all of them declined requests for documents and other information to which Mr. Benzies is entitled under the 2009 Royalty Plan.  For instance, pursuant to Section 2.2.1 of the 2009 Royalty Plan, Take-Two was required to provide to the Rockstar Principals, including Mr. Benzies, Quarterly Statements "outlining the calculation of the amount of the Royalty Pool for such Fiscal Quarter and the balance in the Deposit Account after giving effect thereto … within the thirty (30) day period following the last day of each Fiscal Quarter."  Take-Two failed to timely provide any Quarterly Statements to Mr. Benzies, and Mr. Benzies only received statements in early 2015 in response to a request by his counsel.

101.    On or about March 13, 2015, Take-Two, through counsel, finally provided two years' worth of quarterly distribution statements, initially excluding a critical statement from February 3, 2015, along with a report of past allocations and distributions made to Mr. Benzies under the 2009 Royalty Plan.

102.    The Quarterly Statements reveal that Mr. Benzies has been deprived of many millions of dollars in profit sharing payments to which he was entitled, including those which he should have received during his sabbatical.  Mr. Benzies has not received any distributions since April 28, 2014, and appears to have been excluded from profit-sharing distributions of at least $125,000,000 since that time.

35

103.    In explaining this abrupt withholding to Mr. Benzies, Ms. Kolbe stated that "Sam [Houser] thinks you've had enough," a justification for which there is no authority anywhere, either in the Royalty Plan, related documents, or in the multitude of loving assurances Sam Houser provided Mr. Benzies.  Ms. Kolbe followed this explanation with repeated calls to Mr. Benzies asking whether or not he was planning on returning to Rockstar, implicitly seeking a negative response.

104.    Fearing that the Housers, by and through the Allocation Committee, would distribute money to themselves but  not to Mr. Benzies, Mr. Benzies' counsel in April 2015 sent a letter to Michael Lynch, new counsel for Take-Two, Rockstar and the Housers, instructing them though Mr. Lynch to immediately cease and desist making any further distributions from the royalty pool, and to hold such funds in trust until such time as the Rockstar Principals had resolved how distributions were to be made among them.

105.     On information and belief, the Housers nevertheless made a multi-million dollar distribution to themselves, and again denied Mr. Benzies, again without explanation.

106.    There is a reasonable basis for calculating the royalty payments that are still owed to Mr. Benzies.

107.    Additional amounts will also continue to accrue through sales of games that Mr. Benzies developed and managed.

### FIRST CAUSE OF ACTION:
### BREACH OF FIDUCIARY DUTY (SAM HOUSER)

108.    Plaintiff restates, realleges and incorporates by reference all previous paragraphs.

109.    Sam Houser stood in a fiduciary relationship with Mr. Benzies and was required to fairly represent Mr. Benzies' interests in structuring and negotiating the 2009

36

Royalty Plan and related agreements with Take-Two.  This includes the AGC suite of documents.

110.    Sam Houser advised Mr. Benzies that he would oversee the preparation of all agreements related to profit-sharing and compensation for Mr. Benzies, assured him of his full loyalty, and emphatically stated that both as partner and much-beloved friend he would protect Mr. Benzies' financial interests all consistent with their roles as "partners" in this suite of agreements.

111.    Sam Houser also advised Mr. Benzies that he would serve as the sole contact and liaison with Mr. Hajaj and Paul Weiss throughout the negotiation process of the 2009 Royalty Plan and related agreements.

112.    Mr. Benzies willingly allowed Sam Houser to represent him in these negotiations, based on Mr. Houser's repeated promises, assurances and representations of love, loyalty and partnership.

113.    Mr. Benzies placed the highest level of confidence and reliance in Sam Houser, a reliance that Sam Houser intentionally and knowingly cultivated and encouraged.  Sam Houser exercised control, dominance and influence over Mr. Benzies. As the agreements were drafted, they placed Sam Houser in a position of trust and confidence as to Mr. Benzies, the culmination of Sam Houser's multiple promises, and expressions of love, devotion and partnership.  As a result, a fiduciary relationship existed between Sam Houser and Mr. Benzies.

114.    As a fiduciary, Sam Houser owed Mr. Benzies a duty of loyalty obligating him to put Mr. Benzies' interests first, ahead of his own self-interests, and to refrain from exploiting the relationship for his own personal benefit.

115.    Additionally, as a fiduciary of Mr. Benzies, Sam Houser was subject to the prohibition against self-dealing, a duty to avoid conflicts of interest, a duty to disclose material facts, a duty of care to carry out his responsibilities in an informed and considered manner and to act as an ordinary prudent person would act in the management of his or her own affairs.

116.    Sam Houser breached his fiduciary duty to Mr. Benzies in at least five ways:

a.   *First*, Sam Houser repeatedly proclaimed that he was negotiating the 2009 Royalty Plan on behalf of the Rockstar Principals (and specifically Mr. Benzies) and for their mutual and individual benefit.  However, Sam Houser negotiated a Royalty Plan that, as now interpreted by Defendants, allows Sam Houser to benefit himself over, and at the expense of,  Mr. Benzies.  Sam would later arbitrarily and unilaterally use the Royalty Plan he negotiated as the basis for his self-proclaimed right to deny Mr. Benzies equal profit-sharing without notice, all contrary to his promises and assurances to Mr. Benzies.

b.   *Second*, Sam Houser never advised Mr. Benzies during the formation of, or during the six-years of equal distributions under, the 2009 Royalty Plan that he believed that the Plan could be interpreted so as to give him the unilateral right and authority to deny Mr. Benzies his profit share.  Instead, Sam waited until far later, only claiming he could do so when he terminated Mr. Benzies' profit-sharing during Mr. Benzies' sabbatical.  This act also violated the Sabbatical Agreement.

c.   *Third*, upon information and belief, Sam Houser appointed himself to the Allocation Committee and/or otherwise effectively controlled the allocation of

38

royalties, for his own benefit, and to the resulting detriment of Mr. Benzies, despite his repeated promises to Mr. Benzies that he would protect Mr. Benzies' interests.

    d. *Fourth*, upon information and belief, Sam Houser, in not providing Mr. Benzies with the opportunity to be a member of the Allocation Committee and/or through his effective control of the allocation process, further assumed the duty to ensure Mr. Benzies' equal treatment under the Royalty Plan.

    e. *Fifth*, in arbitrarily withholding Mr. Benzies' profit-sharing distributions during and after Mr. Benzies' sabbatical, Sam Houser increased the profits available for disbursement to his brother and himself from the Royalty Pool.

117.    Each disbursement of a profit share to Sam and Dan Houser without a distribution to Mr. Benzies is a separate breach.

118.    As a result of Sam Houser's breaches of his fiduciary duties to Mr. Benzies, Mr. Benzies suffered damages in an amount to be determined at trial, but believed to be at least $150,000,000 in withheld profit-sharing distributions.

## SECOND CAUSE OF ACTION:
## FRAUDULENT INDUCEMENT AND
## FRAUDULENT CONCEALMENT (SAM HOUSER)

119.    Plaintiff restates, realleges and incorporates by reference all previous paragraphs.

120.    Sam Houser, in order to secure Mr. Benzies' signature on the 2009 Royalty Plan, either misrepresented or concealed the following facts from Mr. Benzies:

    a. That Defendants interpreted the 2009 Royalty Plan to allow them to deny Mr. Benzies profit shares.

39

b.   He was not fulfilling his fiduciary duty to fully and fairly represent Mr. Benzies' interests in the negotiations and was taking action inconsistent with his proclamations of love, loyalty and partnership.

c.   He had deliberately not fully and fairly represented Mr. Benzies' interests in the negotiations in the manner he promised.

d.   He had misrepresented and/or concealed the terms of the 2009 Royalty Plan that he (would) later rely upon in denying Mr. Benzies his profit shares, by failing in any way to call attention to them or directing others to call attention to them, and by manipulating retained counsel ostensibly for the benefit of all Rockstar Principals, but in reality for his and his brother's benefit, to the exclusion of Mr. Benzies.

121.   At the heart of Sam Houser's misrepresentations to Mr. Benzies was the wording and structure of the 2009 Royalty Plan that Sam Houser negotiated with Take-Two.  For example, "Rockstar Principals" is a conspicuous and defined term in the 2009 Royalty Plan, defined on the introductory page to the agreement as "Sam Houser, Dan Houser and Mr. Benzies (collectively, the 'Rockstar Principals.')."  Accordingly, the 2009 Royalty Plan was structured to create the appearance that the Rockstar Principals were to be treated as equals with respect to the allocation of royalties.  The 2009 Royalty Plan contains multiple affirmations of the Rockstar Principals' apparently co-equal rights to royalty payments, particularly in the opening pages of the document.  Accompanying agreements also created precise equality:  the AGC interests were divided between the Rockstar Principals in three equal shares of 33%, and each of the three Principals were paid identical salaries under their respective Employment Agreements.

40

122.    Equal treatment of the Rockstar Principals is further reflected in the fact that the 2009 Royalty Plan nowhere gives the Allocation Committee the explicit right to single out an individual Rockstar Principal by denying him any share of the profits. Indeed, the possibility of excluding just one Rockstar Principal from a distribution is not discussed in any term sheet or any other explanation of deal terms.

123.    In the face of the absence of any explicit right to deny royalties to Mr. Benzies, or disclosure of such a right to Mr. Benzies, Defendants now rely on an 885-word awkwardly constructed paragraph, Section 2.1 "Royalty Allocation", to eliminate equality among the Rockstar Principals and to attempt to deny Mr. Benzies' claim to profit shares. This section includes several internal cross references to other sections of the agreement and as a whole could not be expected to be readily understood by a non-lawyer such as Mr. Benzies.  Furthermore, Section 2.1 contained no explicit right grants to the Allocation Committee to single out one Rockstar Principal for the denial of profit shares.  Rather, the entirety of Section 2.1 assumes that profit share payments will be made.

124.    Paul Weiss was counsel of record for the Rockstar Principals, which included Mr. Benzies.  At no time did Paul Weiss advise Mr. Benzies that Section 2.1, or any other provision of the 2009 Royalty Plan, could  be used to deprive him of any royalty allocations.  Paul Weiss provided no disclosure or admonition to Mr. Benzies to seek separate counsel.

125.    Upon information and belief, Sam Houser understood and/or persuaded Paul Weiss as counsel to *not* explain this aspect of Section 2.1 of the 2009 Royalty Plan or warn Mr. Benzies that, by Sam Houser's interpretation, Section 2.1 could result in the complete elimination of Mr. Benzies' profit shares.

41

126.    If this was Sam Houser's plan and scheme, then the circumstances of Mr. Benzies' execution of the 2009 Royalty Plan played a further role in the deception.  Mr. Hajaj's arrival at Mr. Benzies' Edinburgh offices, his waiting while Mr. Benzies was supposed to review and sign an 800-page document set, and his same-day departure 45-minutes later with the signed set in hand, all suggest a comprehensive plan of haste for the purpose of deception.  Mr. Benzies would not possibly detect that ambiguous language had been deliberately placed into the document by his proclaimed partner who by this action would hold in reserve the ability to deny Mr. Benzies' his profit shares.  Mr. Hajaj contributed to this by being a full participant in the steps needed to perpetrate the deception, including a same-day transatlantic return and his role a liaison to Paul Weiss.

127.    Mr. Benzies executed the documents based on Sam Houser's representations and undertakings as his fiduciary and because he believed that under that relationship, his interests had been fully protected and that Sam Houser's repeated representations that he would protect Mr. Benzies' interests were enshrined in the document.

128.    Sam Houser's actions related to the negotiation and execution of the 2009 Royalty Plan were designed to induce Mr. Benzies to believe that either the Plan itself, and/or its implementation, would result in full royalty equality.  Nothing in any disclosure, e-mail, or other communication prior to execution of the 2009 Royalty Plan indicated to Mr. Benzies that it was conceivable that Sam Houser could deny Mr. Benzies royalty payments while at the same time paying himself and his brother tens of millions of dollars.

129.    Mr. Benzies' longstanding professional and personal relationship with Sam Houser led him to trust Sam Houser with negotiations on his behalf and he believed that the

42

2009 Royalty Plan contained the protections that he was led by his good friend, colleague and fiduciary to expect.  Sam Houser exploited Mr. Benzies' trust and schemed that when Mr. Benzies was given 800 pages to review in under an hour without an explanation or summary, Mr. Benzies would promptly sign without question or objection.  Mr. Benzies had earlier been provided with a document set, along with a term sheet.  The term sheet made no disclosures whatsoever that are in any way consistent with Defendants' current position that they could actually pay Mr. Benzies no royalties.  Furthermore, in the brief time provided, Mr. Benzies was in no position to confirm that what he had previously been sent was the same as what he was now being provided for signature.  Sam Houser intended what happened: Mr. Benzies would rely on his relationship with him and execute the documents without question.  Mr. Benzies did so.

130.    Even had Mr. Benzies attempted to review the 2009 Royalty Plan in the allotted time, he would have, at best, seen the first page identifying him as a co-equal with the other "Rockstar Principals" and believed he was signing a document providing for equitable treatment with his co-Rockstar Principals.  This was consistent with Mr. Benzies' expectations that he would be grouped with the Housers and treated equally.

131.    Sam Houser's actions constitute fraudulent misrepresentation through concealment because he concealed the terms of the 2009 Royalty Plan and the related documents despite his fiduciary duty to disclose material information about them to Mr. Benzies.

132.    Sam Houser had knowledge of all material facts related to the 2009 Royalty Plan and certainly knowledge superior to Mr. Benzies, an advantage he now maintains he used to render the 2009 Royalty Plan unfair to Mr. Benzies.

43

133.   Sam Houser failed to discharge his duty to disclose those facts to Mr. Benzies.

134.   Sam Houser knew that it was improper to withhold this information from Mr. Benzies, but  intentionally withheld it anyway in order to hold in reserve the future opportunity to obtain a better result for himself under the 2009 Royalty Plan to Mr. Benzies' disadvantage.

135.   Mr. Benzies relied on Sam Houser's representations and assurances in signing the 2009 Royalty Plan, reliance that was reasonable because the Plan did indeed appear to operate to create full equality between the Rockstar Principals and there were no indications to the contrary, including on the only extant term sheet.

136.   As a result of Sam Houser's fraudulent misrepresentation and concealment, Mr. Benzies was damaged in an amount to be determined at trial, but believed to be at least $150,000,000 in damages, including lost rights to substantial royalty distributions.

### THIRD CAUSE OF ACTION:
### AIDING AND ABETTING BREACH OF
### FIDUCIARY DUTY (TAKE-TWO AND ROCKSTAR)

137.   Plaintiff restates, realleges and incorporates by reference all previous paragraphs.

138.   Take-Two and Rockstar aided and abetted Sam Houser's breach of his fiduciary duty to Mr. Benzies.

139.   As set forth in the preceding paragraphs, Sam Houser breached his fiduciary duty to Mr. Benzies.   Specifically, among other things, Sam Houser negotiated the 2009 Royalty Plan that, as *now* interpreted by the Housers, Rockstar and Take-Two, left Mr. Benzies with no right to receive any royalty payments whatsoever and no input

44

into or control over the amount of royalty payments he would receive.  Additionally, because the 2009 Royalty Plan has now been interpreted by the Housers, Rockstar and Take-Two to give Sam Houser disbursement authority for profit-sharing distributions, Sam Houser further violated his fiduciary duty by failing to distribute equal profit shares to the Rockstar Principals, particularly Mr. Benzies.

140.    Take-Two and Rockstar knowingly induced and participated in that breach in several ways.

141.    *First*, if indeed the Royalty Plan was designed to allow a Rockstar Principal to be denied a profit share, then Take-Two and Rockstar agreed to the terms of the 2009 Royalty Plan aware of the inequitable treatment that Mr. Benzies could face.

142.    *Second*, Take-Two and Rockstar facilitated the execution of the 2009 Royalty Plan with Sam Houser so as to give Mr. Benzies no time to review the agreement and therefore ensure that Mr. Benzies would not learn of Sam Houser's breach of the fiduciary duty, if indeed Defendants continue to claim this authority was intentionally drafted into the 2009 Royalty Plan.  Mr. Benzies was deprived of any reasonable opportunity to confirm that the execution documents conformed to the term sheet he had been provided that contained no reference to inequality, or any reserved power by any Rockstar Principal to deny payments to another.

143.    *Third*, knowing of Sam Houser's conduct and his fiduciary duty to Mr. Benzies, neither Take-Two nor Rockstar took any action to prevent Sam Houser's breach. To the extent that the companies take the position that Mr. Benzies could be singled out and denied a profit share under the 2009 Royalty Plan, then Take-Two and Rockstar both had actual knowledge of Sam Houser's duty and breach, since both were aware that he was

45

negotiating on behalf of Mr. Benzies, and both companies were intimately involved in the negotiations for and drafting of the 2009 Royalty Plan.  Take-Two and Rockstar had no good faith basis to believe that Mr. Benzies would have knowingly allowed Sam Houser to negotiate an agreement allowing the Housers to terminate profit share distributions to Mr. Benzies.  Take-Two and Rockstar took no action to prevent this outcome and breach.  Nor did they ever separately communicate with Mr. Benzies concerning the negotiations, channeling all communications through Sam Houser, the Rockstar Principals' sole bargaining representative.

144.   *Fourth*, Take-Two and Rockstar intentionally withheld quarterly distribution reports from Mr. Benzies for six years, allowing the Houser brothers additional time to allocate money to themselves and not to Mr. Benzies.

145.   *Fifth*, Take-Two and Rockstar participated in the drafting of the Sabbatical Agreement for Mr. Benzies, which purported to grant Mr. Benzies a sabbatical under amicable terms, when in fact the companies and the Houser brothers intended to oust Mr. Benzies immediately upon the commencement of his sabbatical, as demonstrated by their actions.

146.   *Sixth*, Take-Two and Rockstar also aided Sam Houser's breach of his fiduciary duty to Mr. Benzies even after the 2009 Royalty Plan went into effect. The companies allowed Sam Houser to inequitably distribute profit shares to himself and his brother during Mr. Benzies' sabbatical, but none to Mr. Benzies.  All the while, the companies had representatives on the Allocation Committee responsible for the distributions, with the Houser brothers representing Rockstar, and Take-Two having its own corporate representative.   These companies' representatives on the Allocation

46

Committee proactively aided the inequitable royalty distributions by voting in favor of denying Mr. Benzies his profit shares.

147.    As a result of Take-Two and Rockstar's aiding and abetting Sam Houser's breach of his fiduciary duties to Mr. Benzies, Mr. Benzies suffered damages in an amount to be determined at trial but believed to be at least $150,000,000, including lost rights to substantial royalty distributions.

**FOURTH CAUSE OF ACTION:**
**BREACH OF CONTRACT AND BREACH OF IMPLIED DUTY**
**OF GOOD FAITH AND FAIR DEALING (ROYALTY PLAN)**
**(TAKE-TWO, ROCKSTAR, SAM HOUSER, DAN HOUSER)**

148.    Plaintiff restates, realleges and incorporates by reference all previous paragraphs.

149.    On December 12, 2008, Mr. Benzies, Sam Houser, Dan Houser, Take-Two and Rockstar entered into a valid and binding agreement under the 2009 Royalty Plan, which supersedes and replaces the 2006 Royalty Plan and 2002 Royalty Agreement.

150.    The 2009 Royalty Plan created an Allocation Committee, comprised of two Rockstar Principals and one representative of Take-Two, to allocate funds from the Royalty Pool to "the Rockstar Principals and Eligible Employees."

151.    The 2009 Royalty Plan identifies the Allocation Committee as the decision maker for determining the allocation of profit-sharing and the procedure to be used in doing so, *i.e.* a majority vote.  Upon information and belief, Sam Houser and Dan Houser appointed themselves to represent the Rockstar Principals on the Allocation Committee since its inception.

47

152.     While the 2009 Royalty Plan does not specify the standard to be applied by the Allocation Committee in making decisions about royalty payments, does not expressly provide the Allocation Committee with complete and absolute discretion.

153.     A duty of good faith and fair dealing is implied in the 2009 Royalty Plan.

154.     Even though the Allocation Committee has a right to make distributions, the implied duty of good faith and fair dealing nonetheless imposes an obligation to exercise that authority in a commercially reasonable manner and prohibits the Allocation Committee from acting arbitrarily, capriciously, or in a manner inconsistent with Mr. Benzies' reasonable expectations.

155.     The purpose and structure of the 2009 Royalty Plan and the parties' course of dealing establish Mr. Benzies' reasonable and justifiable expectation that the Rockstar Principals would receive quarterly allocations based on Rockstar's financial performance, and that such allocations would be shared equally among the Rockstar Principals consistent with past practice.

156.     The Rockstar Principals have a justified expectation of receiving quarterly allocations in direct relationship to Rockstar's financial performance.

157.     Mr. Benzies, as an individual Rockstar Principal, has a reasonable expectation of sharing with the other Rockstar Principals in quarterly allocations.  The Rockstar Principals, each of whom executed the 2009 Royalty Plan, are treated and referred to collectively as a group under most of the Royalty Plan's material economic provisions.  Each contributed materially to the games that generated the profits and funds in the Royalty Pool.

48

158.    The 2009 Royalty Plan and the parties' past course of dealing evidences the parties' intent that all of the Rockstar Principals receive and share in the benefit of Royalty Pool allocations.

159.    A duty of good faith and fair dealing is applied to contracts that confer decision-making power on a single party.  The Allocation Committee's authority does not permit a subset of Rockstar Principals to use their position on the Allocation Committee to favor themselves at the expense of the remaining Rockstar Principal.  As a matter of good faith and fair dealing, the Allocation Committee's authority to allocate funds is limited and may not be used or manipulated to deprive Mr. Benzies of millions of dollars.

160.    Sam Houser and Dan Houser, who held the majority of votes necessary to control the Allocation Committee, exercised their authority in an arbitrary and capricious manner, and were motivated by their intent to deprive Mr. Benzies of the benefit of his bargain under the Royalty Plan, for their own financial gain.

161.    Moreover, the decision to eliminate allocations to Mr. Benzies left a greater portion of the Royalty Pool available for allocation to Sam Houser and Dan Houser, benefitting them at Mr. Benzies' expense.

162.    Take-Two's representative on the Allocation Committee also exercised his or her authority in an arbitrary and capricious manner, and was motivated by an intent to deprive Mr. Benzies of the benefit of his bargain under the Royalty Plan.

163.    Take-Two and Rockstar breached their duty of good faith and fair dealing to Mr. Benzies by failing to make royalty payments to Mr. Benzies under the 2009 Royalty Plan.

49

164.    Defendants also breached the 2009 Royalty Plan by failing to provide Quarterly Statements to Mr. Benzies.  Under the 2009 Royalty Plan, Mr. Benzies has been entitled to Quarterly Statements "outlining the calculation of the amount of the Royalty Pool for such Fiscal Quarter and the balance in the Deposit Account after giving effect thereto … within the thirty (30) day period following the last day of each Fiscal Quarter" since the 2009 Royalty Plan's effective date.  (Section 2.2.1).

165.    Mr. Benzies did not receive any such statements until on or about March 6, 2015 he requested, through counsel, past statements.  These statements show that Mr. Benzies has been deprived of many millions of dollars in additional royalty payments.

166.    Mr. Benzies has not received any royalty distributions since April 28, 2014, and has apparently now been excluded from multiple distributions totaling between $93,000,000 and $523,000,000 since the date of his last payment.

167.    Additional amounts will also continue to accrue through sales of games that Mr. Benzies developed and managed.

168.    The royalty payments were an essential term of Mr. Benzies' employment and a key component of his overall compensation.

169.    Take-Two and Rockstar have breached the 2009 Royalty Plan by not paying Mr. Benzies the profit-sharing amounts due him. Each profit-sharing distribution withheld represents a separate breach.

170.    Plaintiff has performed all of his obligations under the 2009 Royalty Plan.

171.    There is a reasonable basis for calculating the royalty payments that are still owed to Mr. Benzies and of which he has been wrongfully deprived.

50

172.     As a result of the Defendants' breach of the 2009 Royalty Plan, Mr. Benzies has been damaged in an amount to be determined at trial, but believed to be at least $150,000,000 for Take-Two's and Rockstar's breach of the 2009 Royalty Agreement.

## FIFTH CAUSE OF ACTION:
## TORTIOUS INTERFERENCE WITH CONTRACT (SABBATICAL AGREEMENT) (TAKE-TWO, ROCKSTAR, SAM HOUSER)

173.     Plaintiff restates, realleges and incorporates by reference all previous paragraphs.

174.     On August 15, 2014, Plaintiff and Rockstar North entered into the Sabbatical Agreement.

175.     At all relevant times, Take-Two, Rockstar and Sam Houser were aware of the Sabbatical Agreement and its terms.

176.     The Sabbatical Agreement's term was to be from September 1, 2014, to April 1, 2015, the date on which Mr. Benzies was to return to work at Rockstar North.  The Sabbatical Agreement also provided that Mr. Benzies would lose *no* pay or benefits as a result of the sabbatical.  In reliance on this, Mr. Benzies agreed to go on sabbatical and executed the Sabbatical Agreement.

177.     Between execution of the 2009 Royalty Plan and the commencement of the sabbatical in 2014, Mr. Benzies and the Housers received exactly equal profit shares, consistent with Mr. Benzies' understanding of the Plan, Sam Houser's fiduciary duty to Mr. Benzies, as well as Sam Houser's promises and representations regarding the partnership between the Rockstar Principals.

51

178.   While Mr. Benzies was on sabbatical, however, Sam Houser interfered with his rights under the Sabbatical Agreement by directing an end to Mr. Benzies' 2009 Royalty Plan profit shares.

179.   Take-Two and Rockstar, which were represented on the Allocation Committee, were complicit by acquiescing in the termination of these payments.  This interference with the Sabbatical Agreement operated to deny Mr. Benzies any further profit shares under the Royalty Plan in an amount estimated to be at least $150,000,000.

### SIXTH CAUSE OF ACTION:
### UNJUST ENRICHMENT (SAM HOUSER AND DAN HOUSER)

180.   Plaintiff restates, realleges and incorporates by reference all previous paragraphs.

181.   Defendants have taken the position that Plaintiff has no right to profit share distributions under the 2009 Royalty Plan.  Defendants claim that their payment of profit share distributions, if any, are within the sole and absolute discretion of the Allocation Committee established under the 2009 Royalty Plan.

182.   Should the Court accept Defendants' interpretation of the 2009 Royalty Plan, then there is effectively no binding and enforceable agreement between Plaintiff and Defendants with respect to profit sharing payments.

183.   If the Court should find that there is no binding and enforceable agreement between the parties with respect to profit sharing payments, then, Sam Houser and Dan Houser were unfairly benefitted from the efforts of Mr. Benzies, and were unjustly enriched at Mr. Benzies' expense when they

184.   received inequitable distributions of at least $96,000,000 during a period when Mr. Benzies received no distributions.

185.    These distributions to Sam and Dan Houser were a product of revenue largely generated by Mr. Benzies' work on the GTA series, which resulted in more than three billion dollars in revenue.

186.    The decision to eliminate allocations to Mr. Benzies left a greater portion of the Royalty Pool available for allocation to Sam Houser and Dan Houser, benefitting them at Mr. Benzies' expense.  It is against equity and good conscience to permit Sam Houser and Dan Houser to retain the royalty payments (profit shares) that rightly belong to Mr. Benzies.

187.    Sam Houser and Dan Houser would be unduly compensated if they were allowed to use their positions as members of the Allocation Committee to retain profits largely generated by Mr. Benzies' efforts.

188.    Accordingly, the Houser brothers were unjustly enriched in an amount to be determined at trial, but believed to be at least $150,000,000 including diverting Mr. Benzies' rights to substantial royalty distributions.

## SEVENTH CAUSE OF ACTION:
## TORTIOUS INTERFERENCE WITH CONTRACT
## (SAM HOUSER AND DAN HOUSER)

189.    Plaintiff restates, realleges and incorporates by reference all previous paragraphs.

190.    Mr. Benzies had various contracts with Take-Two, Rockstar and Rockstar North, including  the Employment Agreement and the 2009 Royalty Plan.

191.    Mr. Benzies' successful, contract-based employment with Rockstar North and his receipt of regular and substantial contract-based profit shares from Take-Two was ongoing, continuous, and customary until Sam Houser and Dan Houser interfered.

53

192.    Sam Houser and Dan Houser had full knowledge of Mr. Benzies' employment and profit-sharing contracts with Rockstar North and Take-Two.

193.    The Housers intentionally interfered with Mr. Benzies' contracts with Rockstar North and Take-Two by:  (a) cutting off all communications and access between Mr. Benzies and Rockstar North during Mr. Benzies' sabbatical; (b) forcing Rockstar North's termination of Mr. Benzies' son and two close colleagues; (c) terminating all allocation payments to Mr. Benzies based solely on the explanation that "Sam [Houser] thinks you had enough"; (d) arranging with Take-Two and its attorneys to frustrate Mr. Benzies' return to work and offering a deal (worth a tiny fraction of Mr. Benzies' actual losses) for Mr. Benzies to resign; and (e) "poisoning the well" by defaming Mr. Benzies to his Rockstar North employees.

194.    The Housers acted out of malice and used dishonest, unfair, and improper means in interfering with Mr. Benzies' contracts with Rockstar North and Take-Two.  Sam Houser, repudiating all promises and assurances he had made as Mr. Benzies' fiduciary, actively engaged in manipulations he knew would block Mr. Benzies' profit-sharing, and doing so to enlarge the pool of funds from which he then would receive a larger share of profits.  If indeed he planned this from the time the contracts were negotiated and signed, he manipulated retained counsel, concealed from Mr. Benzies that he was engaged in this plan and scheme, and then used his authority and influence within both Rockstar and Take-Two to orchestrate the final outcome by which Mr. Benzies was denied his shares of profits, all while using the ruse of a "sabbatical" to implement this scheme.  Enlarging the profit-sharing pool to enrich both himself and his brother was at the direct expense of his fiduciary Mr. Benzies.  Dan Houser, fellow Rockstar Principal, acquiesced in all respects.

54

195.    Not only did Sam Houser covet and then convert Mr. Benzies' portion of the Royalty Pool, Sam Houser's efforts to frustrate Mr. Benzies' return to work showed clear intent to harm Mr. Benzies.

196.    Sam Houser's interference, manipulations, and deceptions, joined with Dan Houser's complicity (by failing to object or intervene), caused injury to Mr. Benzies' relationship with Take-Two and Rockstar North.  Mr. Benzies had been receiving substantial quarterly royalty allocations from Take-Two and had a strong and successful relationship with his staff at Rockstar North, but after the Housers' interference, Mr. Benzies' contracts with both Rockstar and Take-Two have been manipulated to his disadvantage.

197.    The Housers' interference with Mr. Benzies' contracts impeded Mr. Benzies' return to work after his sabbatical and further caused Mr. Benzies to have been deprived of his profit shares under the Royalty Plan.

### EIGHTH CAUSE OF ACTION:
### REFORMATION
### (TAKE-TWO, ROCKSTAR, SAM HOUSER, DAN HOUSER)

198.    Plaintiff restates, realleges and incorporates by reference all previous paragraphs.

199.    On December 12, 2008, Mr. Benzies, Sam Houser, Dan Houser, Take-Two and Rockstar entered into an agreement under the 2009 Royalty Plan, which supersedes and replaces the 2006 Royalty Plan and 2002 Royalty Agreement.

200.    Defendants have taken the position that the 2009 Royalty Plan gives the Allocation Committee complete, absolute and unfettered discretion in determining the amount of the allocations of profit sharing to Mr. Benzies.

55

201.    Defendants have taken the position that Mr. Benzies effectively has no rights to profit shares.

202.    At the time Mr. Benzies executed the 2009 Royalty Plan, however, he did not believe that the Allocation Committee had absolute discretion with respect to profit share allocations and distributions.

203.    At the time Mr. Benzies executed the 2009 Royalty Plan, he believed that he had co-equal rights to profit share distributions with his fellow Rockstar Principals.

204.    To the extent that Mr. Benzies' beliefs with respect to the Allocation Committee and profit sharing were mistaken, his beliefs were induced by the fraud of the counter-parties to the 2009 Royalty Plan.

205.    At the time he executed the 2009 Royalty Plan, Mr. Benzies was not effectively represented by counsel.

206.    Mr. Benzies has been injured because he has not been treated as an equal Rockstar Principal in terms of profit-sharing distributions and has received less money in profit -sharing distributions than he is entitled to.

207.    The 2009 Royalty Plan should be reformed so that Mr. Benzies is treated equally to the two other Rockstar Principals in terms of profit-sharing distributions.

### NINTH CAUSE OF ACTION:
### <u>CONSTRUCTIVE TRUST (TAKE-TWO, SAM HOUSER, DAN HOUSER)</u>

208.    Plaintiff restates, realleges and incorporates by reference all previous paragraphs.

209.    By a series of letters commencing on February 23, 2015, Sam Houser, in his capacity as Mr. Benzies' fiduciary and the recipient of the wrongful distributions, Dan Houser as the recipient of the wrongful distributions, and Take-Two, in its capacity as the

56

source of funds from which the Rockstar Principals were paid pursuant to the 2009 Royalty Plan, were placed on notice that Mr. Benzies made demand against Royalty Plan proceeds, requesting that no further payments be made to any Rockstar Principal until this dispute was resolved.   Thereafter, all such funds in the royalty pool, subject to any such distribution, should have been held in constructive trust until competing claims could be addressed and resolved.

210.   Sam Houser ignored the demand of his fiduciary and instead caused $80,000,000 to be distributed to himself and to Dan Houser in August 2015.  Take-Two, the source of these funds, consented to this disbursement.

211.   Sam Houser and Dan Houser were unjustly enriched by these distributions to the extent that they received monies in which Mr. Benzies has a beneficial interest.

212.   Plaintiff has an interest in the funds in the royalty pool as well as the funds wrongfully distributed to Sam and Dan Houser.

213.   The Court should impose a constructive trust on the aforesaid funds.

214.   To the extent a constructive trust came into existence upon notice from Mr. Benzies of his claims to the aforesaid funds, then Sam Houser's orchestration of this disbursement, and Take-Two's consent to the disbursement, both violated the implied terms of the constructive trust created by Mr. Benzies' demand that no such payments be made.   Sam Houser and/or Take-Two, co-complicit in the violation of the terms of the constructive trust, are jointly and severally liable for the distribution wrongly made.  Any subsequent distributions to Sam or Dan Houser would also be in violation of the constructive trust.

215.    The amount of the constructive trust is established by calculations set forth in the 2009 Royalty Plan, which are the funds distributed subsequent to Mr. Benzies' demand that they not be.   Mr. Benzies is entitled to his proper equal share of these distributions.

**TENTH CAUSE OF ACTION:**
**BREACH OF SABBATICAL AGREEMENT**
**(ROCKSTAR NORTH)**

216.    Plaintiff restates, realleges and incorporates by reference all previous paragraphs.

217.    On or about August 15, 2014, Plaintiff and Rockstar North entered into the "Sabbatical Agreement."

218.    The Sabbatical Agreement provided that Plaintiff would return to active employment with Rockstar North on April 1, 2014 unless:  (i) the term of the duration of the sabbatical was extended by a mutual agreement of the parties memorialized in a written amendment to the Sabbatical Agreement; or (ii) Plaintiff provided Rockstar North 30 days written notice of his election not to return from the sabbatical to active employment with Rockstar North.

219.    Plaintiff and Rockstar North did not enter into a written amendment to the Sabbatical Agreement extending the term of the sabbatical nor did Plaintiff provide written notice under the Sabbatical Agreement that he had elected not to return to active employment.  In fact, Plaintiff expressed his desire to return on multiple occasions, in his conversations with Rockstar's designated executive Jennifer Kolbe, and by and through his attorneys to Take-Two's and Rockstar's attorneys.

58

220.    Notwithstanding that Rockstar North had expressly agreed in the Sabbatical Agreement that Plaintiff was entitled to return to active employment on April 1, 2014, Rockstar North caused its employees to physically bar Mr. Benzies' return to the Rockstar North premises when he attempted to return to active employment on April 1, 2014.

221.    Rockstar North's refusal to allow Plaintiff to return to active employment constituted a breach of the Sabbatical Agreement.

222.    Rockstar North further breached the Sabbatical Agreement by stripping Plaintiff of his title and all duties and responsibilities with the company.

223.    As a result of this breach, Mr. Benzies was damaged in an amount to be determined at trial, but believed to be at least $150,000,000 in damages.

### ELEVENTH CAUSE OF ACTION:
### CONSTRUCTIVE DISCHARGE
### (ROCKSTAR NORTH)

224.    Plaintiff restates, realleges and incorporates by reference all previous paragraphs.

225.    To the extent that Rockstar North claims that Mr. Benzies voluntarily resigned, Mr. Benzies was forced into an involuntary resignation by intolerable changes to his working conditions and diminution of duties such that Rockstar North constructively discharged him from his employment.

226.    In addition to physically barring Plaintiff from returning to active employment on April 1, 2014 upon termination of his sabbatical, Rockstar North engaged in the following wrongful conduct that effectively prevented Mr. Benzies from performing his duties as President of Rockstar North:  (i) it terminated key Rockstar North employees that had worked under, and reported to, Plaintiff; (ii) while Plaintiff was barred from the

59

Rockstar North offices, Take-Two and Rockstar executives were allowed to interrogate Rockstar North employees with respect to Plaintiff's performance in an attempt to undercut his authority and ability to resume his duties as President of Rockstar North; and (iii) it refused to restore Plaintiff's phone and e-mail access.

227.    As a result of these and other actions taken by Rockstar North, Plaintiff was effectively prevented from returning to his duties as President of Rockstar North following his sabbatical.

228.    The working conditions created by Rockstar North were intolerable as they effectively stripped Mr. Benzies of his title and position at the company and prevented him from performing his duties and responsibilities.

229.    Rockstar North created these intolerable working conditions intentionally and/or allowed them to exist.

230.    A reasonable employer would have realized that a reasonable person in Plaintiff's position would be compelled to resign.

231.    As a result of Plaintiff's constructive discharge by Rockstar North, Mr. Benzies was damaged in an amount to be determined at trial, but believed to be at least $150,000,000 in damages.

### TWELFTH CAUSE OF ACTION:
### <u>DECLARATION OF RIGHTS (ROCKSTAR NORTH)</u>

232.    Plaintiff restates, realleges and incorporates by reference all previous paragraphs.

233.    Plaintiff requests a declaration that:  (i) he has been terminated within the meaning of the Employment Agreement without Cause, or that he was entitled to terminate the Employment Agreement for Good Reason; (ii) he provided proper notice to Rockstar

60

North of this termination; and (iii) he is entitled to all pay, benefits, and compensation associated with  the end of his employment, as defined in the letter from Mr. Benzies' counsel entitled "Notice of Employee's Termination for Good Reason Pursuant to Sections 2 and 6 of Leslie Benzies' Amended and Restated Employment Agreement Dated September 12, 2012."

234.    Plaintiff requests a declaration that to the extent it is determined that Sam Houser did not intend to reserve discretion to deny any individual Rockstar Principal distributions under the 2009 Royalty Plan, then such right cannot be read into the agreement.

235.    As a result of a discharge under these circumstances, Mr. Benzies is entitled to various forms of compensation and other pay and benefits in an amount to be proved at trial.

## THIRTEENTH CAUSE OF ACTION:
## BREACH OF MEDIATION AGREEMENT  (TAKE-TWO)

236.    Plaintiff restates, realleges and incorporates by reference all previous paragraphs.

237.    In May 2015, Mr. Benzies, Take-Two, Rockstar and the Housers entered into a Mediation Agreement (the "Mediation Agreement").

238.    Plaintiff has performed all of his obligations under the Mediation Agreement.

239.    The parties to the Mediation Agreement agreed that:

> To the extent that either Party is asked by any person in the media (any person or entity engaged in radio, television or internet broadcasting, or to persons and entities that gather or report information on trade and business practices) about each other, each Party agrees that, until the Mediation has concluded by the Mediator

61

> declaring it terminated, the Party shall not respond at all or may respond "No Comment" without reference to anything in this Agreement or anything regarding the dispute that is the basis for this Agreement.

(Section 7(b) of Mediation Agreement).

240.    Take-Two claims that on January 6, 2016, it was approached by a blogger from kotaku.com requesting a statement about Mr. Benzies' status with Rockstar.   On January 12, 2016, Take-Two requested that Mr. Benzies approve a press release prepared by Take-Two addressing Mr. Benzies' departure.   Take-Two explained its request   as follows:

> While we would prefer to reach an agreement on a statement, the company believes that a "no comment" or similar statement will cause greater speculation and will have a negative impact on both sides – and on Mr. Benzies even more so.  I am available to discuss this further this evening, but please be aware that the company will release the statement as drafted above if it determines it is necessary to do so.  Please also understand that Take-Two's status as a public company will necessarily impact its decision-making in this instance.

241.    In that January 12, 2016 e-mail, Take-Two proposed the following statement to the media:

> After an 18 month sabbatical from Rockstar North, Leslie Benzies has made the decision not to return to work for the company. We are very grateful for Leslie's contributions to Rockstar over the last 15 years as we worked together to make amazing games.
>
> Leslie helped us build an incredible team that will continue to create great experiences for our fans. Leslie will always be a friend to the company and of course we are going to miss him but we wish him the absolute best for the future.

242.    Mr. Benzies took the continuing position that communications during mediation were barred under the Mediation Agreement (except for "No Comment"), but agreed to consider proposals.  In an email to Take-Two and Rockstar counsel, Mr. Benzies'

62

attorney Christopher Bakes expressly *rejected* Take-Two's proposed draft. Among other reasons, Mr. Benzies rejected the statement because it was factually incorrect.  Mr. Benzies' sabbatical lasted only for six months, not 18 months; and he did not want to issue a press release while the mediation was pending.

243.    Despite this response, and without ever receiving approval from Mr. Benzies to deviate from the covenants in the Mediation Agreement, Take-Two issued to Kotaku.com the very same press release that had been rejected by Mr. Benzies.  This breached the Mediation Agreement.

244.    There was no urgency or justification of any kind for the Defendants' unilateral and intentional breach.

245.    After Take-Two issued its unauthorized press release, Kotaku.com published a story on January 12, 2016, publishing in sum and substance the entire content of Take-Two's press release.  Take-Two Chief Executive Strauss Zelnick repeated the press release in sum and substance during the company's earnings call on February 3, 2016.

246.    Take-Two's breach of Section 7(b), the media blackout provision, of the Mediation Agreement damaged Mr. Benzies in an amount to be decided at trial.

### FOURTEENTH CAUSE OF ACTION: DEFAMATION PER SE (TAKE-TWO)

247.    Plaintiff restates, realleges and incorporates by reference all previous paragraphs.

248.    Take-Two's press release misrepresented the true facts concerning Mr. Benzies' sabbatical by falsifying the length of the sabbatical and making it appear that Mr. Benzies elected to end his employment by not returning from sabbatical.

63

249.    In the industry, a sabbatical of just six months, the actual agreed length of Mr. Benzies' sabbatical, would not be unusual for a professional in Mr. Benzies' position at the conclusion of two large projects, such as GTA 5 and GTA Online.  However, a sabbatical of 18 months, as inaccurately stated in Take-Two's press release, falsely implies that Mr. Benzies was either having difficulty with Take-Two or other professional challenges impeding a swifter transition.  By falsifying the length of his sabbatical, Take-Two attempted to harm Mr. Benzies' reputation in the video game industry and his ability to continue to work in the industry.  Take-Two Chief Executive Strauss Zelnick repeated the press release in sum and substance during the company's earnings call on February 3, 2016.

250.    Furthermore, issuing a press release under any circumstance was contrary to Take-Two's long-standing custom and practice to avoid virtually all types of public announcements regarding all matters, certainly including high-level company events. Take-Two's practice was instead to issue "no comment" responses to media inquiries. Issuing this particular press release, which was false and in contravention of an explicit contract prohibiting it, was specifically intended to harm Mr. Benzies while creating the false impression that his transition to other opportunities was smooth and consensual.  It was neither.

251.    Take-Two's defamation damaged Mr. Benzies in his trade or business, and did so in an amount to be decided at trial.

### FIFTEENTH CAUSE OF ACTION:
### <u>FRAUD (TAKE-TWO, ROCKSTAR, SAM HOUSER)</u>

252.    Plaintiff, restates, realleges and incorporates by reference all previous paragraphs.

64

253.    At all relevant times, Mr. Benzies believed that he was being represented by the law firm of Paul Weiss in connection with all matters related to his employment at Rockstar North, including his employment agreements, compensation (in all forms, including profit sharing), and all matters relevant to AGC.  Mr. Benzies further believed that Paul Weiss was working under the direction of his fiduciary Sam Houser, and that he, Mr. Benzies, therefore had two distinct layers of fiduciary protection in the negotiation and execution of the 2009 Royalty Plan and related agreements.  If indeed Sam Houser at that time harbored the undisclosed plan to eventually deny Mr. Benzies profit shares, or if he at the time harbored the plan to retain the power to do so, then not disclosing this to Mr. Benzies and instead inducing him to sign agreements wherein he believed he was an equal Rockstar Principal with full and equal rights of profit distribution, then Mr. Houser, on his and Defendants' behalf, committed fraud.

254.    Specifically, if indeed Mr. Houser intended that the 2009 Royalty Plan be designed to provide him undisclosed powers to withhold profit shares from Mr. Benzies, he knew or should have known that had Mr. Benzies known the truth, Mr. Benzies would not have signed the Agreements and his acutely valuable services would have been lost to Defendants.

255.    Mr. Benzies was repeatedly led to believe that he was equal and that both Sam Houser and Paul Weiss would ensure this outcome.

256.    Among these assurances was an October 2, 2008 e-mail chain, on which Mr. Benzies was copied, in which Seth Krauss, the Executive Vice President and General Counsel of Take-Two, referred to Plaintiff as being represented by Paul Weiss (along with the other Rockstar Principals) ("your three clients Sam Houser, Dan Houser and Leslie

65

Benzies") in connection with various amendments to their employment agreements.  The e-mail expressly and repeatedly refers to Paul Weiss as counsel for Mr. Benzies and the other Rockstar Principals, using such phrases as:

- ". . . all communications and notices to the Principals under their respective Employment Agreements . . . shall be made to you, as counsel, on their behalf"

- "All communications and notices by the Principals (defined as Mr. Benzies and the Housers) to the Company under their respective Employment Agreements . . . shall be made via electronic mail to you, as counsel, on their behalf . . ."

- In the event that at any time on or prior to October 31, 2008 the Company notifies you, as counsel for all the Principals . . ."

257.    Mr. Krauss intended that his e-mail be forwarded by Paul Weiss to Mr. Benzies, asking that Paul Weiss cause "each Principal to reply . . ."

258.    Mr. Hajaj made further representations that Paul Weiss was acting as Mr. Benzies' U.S. lawyers, including the following:

a.   By an e-mail dated April 24, 2012 to Alexandra Docherty of Paul Weiss from Mr. Hajaj, the Head of Finance & Corporate Development for Rockstar, noted that he was copying "Leslie's US lawyers from Paul Weiss including tax counsel…" The Paul Weiss lawyers copied by Mr. Hajaj were J. Schwab, P. Karsnitz and J. Samuels. Hajaj referenced  "a potential transaction which could have some implications for [Mr. Benzies'] personal tax situation."

b.  Mr. Benzies entered into an Amended and Restated Employment Agreement with Rockstar dated "as of September 12, 2012." This agreement, which specifically references the 2009 Royalty Plan and Mr. Benzies' 2008 Amended and Restated Employment Agreement.  In an e-mail from Mr. Hajaj to

66

Mr. Benzies dated August 16, 2012, Mr. Hajaj references the "updated employment agreement" and states "James Schwab @ Paul Weiss is of course fully representing you already…."

259.    The 2009 Royalty Plan itself, which was negotiated by Sam Houser, Mr. Hajaj and Take-Two expressly provided that all notices to the Rockstar Principals be sent to each Principal, with a copy to Paul Weiss.

260.    All of the foregoing representations to the effect that Paul Weiss was representing Mr. Benzies' interests in connection with all matters related to his employment with Rockstar North, including his compensation, were intended to induce Mr. Benzies to rely on Paul Weiss to protect his interests, and to do so through his fiduciary Sam Houser.

261.    Mr. Benzies did so rely on these representations and believed that Paul Weiss was his legal counsel and was representing him in connection with all matters related to his employment with Rockstar North, and that it would do so through Sam Houser.

262.    The intended and foreseeable result of the representations that Paul Weiss was Mr. Benzies' legal counsel and was representing and protecting his interests, all occurring through fiduciary Sam Houser, was to induce Mr. Benzies to rely both on Paul Weiss and Sam Houser in connection with the various agreements he was asked to sign.

263.    Paul Weiss has since taken the position that it did not represent Mr. Benzies in connection with the 2008 Royalty Plan, his employment agreement or any other agreements executed by Mr. Benzies.  Paul Weiss has gone so far as to claim that Mr. Benzies is not now, nor has he ever been, a client of the firm.

67

264.    To the extent that Paul Weiss did not represent Mr. Benzies, then defendants Take-Two, Rockstar, and Sam Houser knew at the time they made the false representations and concealed the material facts alleged above that such representations were untrue and that they were concealing material facts from Mr. Benzies, including manipulation of his attorney-client relationship with Paul Weiss.

265.    If indeed Defendant Take-Two, Rockstar, and Sam Houser continue to maintain that the 2009 Royalty Plan was always intended to support denial of a Rockstar Principal's profit-share, then they each acted with the intention to deceive and mislead Mr. Benzies, and to fraudulently induce him to enter into agreements that failed to adequately protect his rights and reasonable expectations, all with the understanding that he was a critical ingredient to Defendants' continued financial success.

266.    Plaintiff acted in reliance on these false and misleading representations to his detriment, and was thereby induced to execute documents that failed to adequately protect his rights and reasonable expectations.

267.    As a direct and proximate result of the false representations of defendants Take-Two, Rockstar, and Sam Houser, Mr. Benzies was damaged in an amount to be determined at trial, but believed to be at least $150,000,000 in damages.

WHEREFORE, Plaintiff Leslie Benzies demands judgment as follows:

1.    That judgment be entered in favor of Plaintiff and against Defendants on Plaintiff's Breach of Fiduciary Duty Claim (First Cause of Action) in the amount of no less than $150,000,000, plus any additional applicable interest and damages, including punitive damages, in amounts to be determined at trial;

68

2.      That judgment be entered in favor of Plaintiff and against Defendants on Plaintiff's Fraudulent Inducement Claim (Second Cause of Action) in the amount of no less than $150,000,000, plus any additional applicable interest and damages, including punitive damages, in an amount to be determined at trial;

3.      That judgment be entered in favor of Plaintiff and against Defendants on Plaintiff's Aiding and Abetting Breach of Fiduciary Duty (Third Cause of Action) in the amount of no less than $150,000,000, plus any additional applicable interest and damages, including punitive damages, in amounts to be determined at trial;

4.      That judgment be entered in favor of Plaintiff and against Defendants on Plaintiff's Breach of Contract (Royalty Plan) (Fourth Cause of Action) in the amount of no less than $150,000,000, plus any additional applicable interest and damages in an amount to be determined at trial;

5.      That judgment be entered in favor of Plaintiff and against Defendants on Plaintiff's Interference with Contract Claim (Sabbatical Agreement) (Fifth Cause of Action) in the amount of no less than $150,000,000, plus any additional applicable interest and damages in an amount to be determined at trial;

6.      That judgment be entered in favor of Plaintiff and against Defendants on Plaintiff's Unjust Enrichment Claim (Sixth Cause of Action) in the amount of no less than $150,000,000, plus any additional applicable interest and damages in an amount to be determined at trial;

7.      That judgment be entered in favor of Plaintiff and against Defendants on Plaintiff's Tortious Interference with Contract Claim (Seventh Cause of Action) in the

amount of no less than $150,000,000, plus any additional applicable interest and damages in an amount to be determined at trial; and

8.      That judgment be entered in favor of Plaintiff and against Defendants on Plaintiff's Reformation Claim (Eighth Cause of Action) in the amount of no less than $150,000,000, plus any additional applicable interest and damages in an amount to be determined at trial; and

9.      That judgment be entered in favor of Plaintiff and against Defendants for Constructive Trust (Ninth Cause of Action) in the amount of no less than $150,000,000, plus any additional applicable interest and damages in an amount to be determined at trial;

10.     That judgment be entered in favor of Plaintiff and against Defendants for Breach of the Sabbatical Agreement (Tenth Cause of Action) in the amount of no less than $150,000,000, plus any additional applicable interest and damages in an amount to be determined at trial

11.     That judgment be entered in favor of Plaintiff and against Defendants on Plaintiff's Constructive Discharge Claim (Eleventh Cause of Action) in the amount of no less than $150,000,000, plus any additional applicable interest and damages in an amount to be determined at trial;

12.     That judgment be entered in favor of Plaintiff and against Defendants for a Declaration of Rights pursuant to the 2012 Employment Agreement (Twelfth Cause of Action) in the amount of no less than $150,000,000, plus any additional applicable interest and damages in an amount to be determined at trial;

13.     That judgement be entered in favor of Plaintiff and against Defendants on Plaintiff's Breach of Mediation Agreement Claim (Thirteenth Cause of Action) in the

amount of no less than $150,000,000, plus any additional applicable interest and damages in an amount to be determined at trial;

14.     That judgement be entered in favor of Plaintiff and against Defendants on Plaintiff's Defamation Per Se Claim (Fourteenth Cause of Action) in the amount of no less than $150,000,000, plus any additional applicable interest and damages, including punitive damages, in amounts to be determined at trial;

15.     That judgement be entered in favor of Plaintiff and against Defendants on Plaintiff's Fraud Claim (Fifteenth Cause of Action) in the amount of no less than $150,000,000, plus any additional applicable interest and damages in an amount to be determined at trial;

16.     That this Court grant Plaintiff such other and further relief which it may deem just and proper.

Dated:  April 12, 2016                     Respectfully submitted,
        New York, New York

                                           **LOCKE LORD LLP**

                                           By:  _s/Allen C. Wasserman_____
                                                Christopher J. Bakes
                                                Allen C. Wasserman
                                                Casey B. Howard

                                                200 Vesey Street, 20th Floor
                                                New York, New York 10281
                                                (212) 415-8600
                                                cbakes@lockelord.com
                                                awasserman@lockelord.com
                                                choward@lockelord.com
                                                *Counsel for Plaintiff Leslie Benzies*

71